**ANGLIM, Collector of Internal Revenue, v. EMPIRE STAR MINES CO., Ltd.**

**No. 10001.**

Circuit Court of Appeals, Ninth Circuit.

Aug. 7, 1942.

Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, A. F. Prescott, and Michael Gould, Sp. Assts. to Atty. Gen., and Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellant.

Robert M. Searls, John Parks Davis, and Willard Lee Pope, all of San Francisco, Cal., for appellee.

Before MATHEWS, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The Collector appeals from an adverse judgment in a suit for refund of taxes exacted under Titles VIII and IX of the Social Security Act, Act of August 14, 1935, Chapter 531, 49 Stat. 620, 42 U.S.C.A. § 1004 et seq.[1] The question for determination is whether or not miners operating under a certain type of lease are employees within the intendment of the Act.

By the statute an excise tax is imposed on every employer, with respect to having individuals in his employ, equal to a percentage of the wages paid by him with respect to "employment" as that term is

---

[1] The taxes collected were for the years 1937, 1938, and 1939.

defined in the statute. With exceptions unimportant here, employment is defined as "any service, of whatever nature, performed within the United States by an employee for his employer." 42 U.S.C.A. §§ 1011(b) and 1107(c).

There is no controversy as regards the facts. Since 1929 the taxpayer has operated a group of mines in California, one of which, the North Star Mine, contains about 150 miles of underground workings. Portions of the underground area reputed to contain good ore were so remote from the only available shaft that they did not permit of profitable operation by the taxpayer itself. Believing that these remote areas could be mined successfully by independent leasers, working with the incentive of a greater return than a day's wage, and exercising more than the usual care in the selection and handling of ore, the taxpayer, in 1930, adopted a program of leasing them on a royalty basis. Written leases were made granting to the lessees, for a period of six months, the exclusive right to mine specified areas. The majority of the lessees, all of whom were experienced miners, had previously worked in the mine and were familiar with the particular ground selected. While each contract was made with a single lessee, each such lessee was in fact the representative of a small group the members of which had associated themselves together as partners for the purpose in hand. These leases were extended, sometimes orally, for successive periods. Written leases were signed in 1935 and again in 1939. At the time of the trial there were about thirty miners working under leasing arrangements. Colloquially, these men were referred to as "leasers."

The terms of the lease contracts are substantially uniform except as to the description of the area. The lessee, in addition to the exclusive right to mine, is given the right to carry on development work within the leased area and to exploit under the terms of the lease any new ore bodies discovered. The lessee agrees to furnish all necessary labor for mining the ore and transporting it to the shaft, from which point the lessor agrees to hoist it and transport it to the ore bins. The lessee, however, is to provide the labor for transporting the ore from bin to mill, as well as for milling and concentrating it, and for disposing of the tailings. All work is agreed to be performed by the lessee in a good and minerlike manner. In supplying necessary labor the lessee may employ workmen upon either a wage or a profit-sharing basis at his option, but may not employ men in excess of a certain number varying with each lease. It is provided that there shall be no privity of contract between the lessee's employees and the lessor and that all such employees, whether on a wage or tribute basis, shall under no circumstances be deemed the employees of the lessor. The lessee assumes sole responsibility for the operation and direction of the work, and agrees to carry compensation insurance sufficient to cover all hazards incident thereto.

While the lessor has no part in the "selection, employment or direction" of the employees, the lessee agrees upon written request to discharge any employee designated by the lessor as objectionable. The lessor undertakes to furnish machine drills, together with compressed air and the accessories and fittings necessary for the operation of the drills; and to furnish track, pipe, tools, picks, shovels, and drill steel, and to sharpen the steel and picks as required. It agrees to provide power for hoisting and power and water for milling and for the disposal of tailings; also to sell to the lessees at cost to itself all required explosives and fuse—an arrangement, incidentally, of substantial advantage to the leaser. The lessor is to supply facilities at its mill for crushing and treating the ores, and undertakes to retort the amalgam and market the bullion. (Apparently, after the milling operation is completed, the lessor purchases the concentrates outright, their value being determined by the usual sampling methods.) The lessee is to have no interest in the tailings. The lessor has the right to inspect both the underground workings and the milling operations "for the purpose of determining the grade of ore being mined, the size and location of veins and the efficiency of the milling operations." It may regulate the tramming, hoisting, and storage of the ore and the treatment of it at the mill. It has the right to perform exploration work within the leased area, subject to the prior right of the lessee to do the same. In the event a discovery is made by the lessor, it has the exclusive right to mine and mill the ore on its own account. The lessor retains a royalty of 50% of the gross recoveries of amalgam and concentrates, and the remaining 50% goes to the lessee. There is a provision for monthly settlements.

The lease is terminable by the lessee on ten days' written notice, and by the lessor upon the following contingencies: (a) failure of the lessee to perform any covenant; (b) suspension by the lessor of all its operations; (c) destruction of the mine; (d) discovery that substantial amounts of ore, amalgam, or concentrates are being stolen or not accounted for; (e) assignment of the lease without the written consent of the lessor; and (f) financial loss sustained by the lessor for a period of thirty days after written notice of such loss to the lessee. The lessor must give ten days' written notice of any of these grounds of forfeiture except (c) and (d), the lessee to have the opportunity meanwhile to cure his breach.

Operations under these leases differed substantially from those of the taxpayer itself. The leasers had a free hand in determining where and in what manner to work their areas, how to sort the ore, what to discard as waste, etc. Taxpayer's only supervisory official to visit their work was the safety engineer, who made periodic inspections in conformity with state laws. (In contrast with this, the taxpayer's operations were subject to the constant supervision of its shift bosses, foreman, superintendent, and its general manager.) The milling operations were likewise under the direction of the leasers themselves, and although they were assisted by the skilled employees of the lessor they were charged for such service. Suggestions of the lessees as to the size of screens to be put on the batteries, the amount of quicksilver to be fed on the plates, changes to be made in the tables, and the like, were frequent and were always carried out. Days were set apart for milling the ore of each group. Separate accounts were kept, and the head leaser was given a copy of the mint returns together with a settlement sheet showing the deductions for agreed charges. The settlement check was made out in favor of the head leaser, who handled the accounts for his group. The leasers in a particular group decided for themselves on the division of profits and made their own rules governing such matters as layoffs, and the like. Occasionally they hired men at wages to carry on for partners who had temporarily laid off. The average earnings of these leasers were substantially in excess of the wages paid to the regular employees of the taxpayer. They appear in practice to have had untrammeled discretion in the selection of their associates. Whenever a new man was associated in a group he was taken before the mine superintendent for the purpose of furnishing information required in connection with workman's compensation records, and at that time it would be carefully explained to him that he was working under a lease and not as an employee of the taxpayer. The taxpayer has never requested that a leaser be discharged, but on one occasion it procured the temporary layoff of a leaser for violation of a safety rule.

In connection with its regular employees the taxpayer maintained hiring cards bearing detailed information, and it required rigid medical examinations. The taxpayer had about three hundred regular employees. As to the leasers no such cards were kept and no examinations required, nor were the leasers permitted to become members of the employees' hospital association operated by the taxpayer. As a convenience to the leasers the taxpayer maintained cards pertaining to their workmen's compensation, but the policies were paid for by the leasers.

So much for the facts. Applying the ordinary legal tests, as the statute appears to have intended, the trial court concluded that the leasers were independent contractors. It is the position of the government that the regulations promulgated under the Act[2] require a contrary holding. It

[2] Article 3 of Treasury Regulations 91, promulgated under Title VIII (identical with Article 205 of Treasury Regulations 90, promulgated under Title IX) is as follows:

"Art. 3. Who are employees.—Every individual is an employee within the meaning of Title VIII of the Act if he performs services in an employment as defined in section 811 (b) (see article 2).

"However, the relationship between the person for whom such services are performed and the individual who performs such services must as to those services be the legal relationship of employer and employee. Generally, such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be

argues further that since the tax provisions are integral parts of the remedial system of old age and survivors insurance enacted to promote the general welfare, the term "employee" should have a liberal interpretation to effect the legislative purpose.

■ However, in defining the required relationship, and in drawing the distinctions between an employee and an independent contractor, the regulations do no more than reiterate the familiar principles of the common law. Cf. Restatement, Agency §§ 2, 220. Such has been the view uniformly taken of them by the courts in cases arising under the statute. Texas Co. v. Higgins, 2 Cir., 118 F.2d 636; Indian Refining Co. v. Dallman, 7 Cir., 119 F.2d 417, affirming D.C., 31 F.Supp. 455; Williams v. United States, 7 Cir., 126 F.2d 129; Jones v. Goodson, 10 Cir., 121 F.2d 176. It is said that the language of the concluding paragraph of the regulations, relating to physicians, etc., assumes that a person is not to be classed as an independent contractor unless he follows an independent vocation, offering his services to the public. But we think these general exclusions do not modify the tests previously outlined in the regulations, and that they were not so intended.

■ The leasers appear both in theory and in practice to have been really independent operators. In respect of the right of the lessor to request the discharge of objectionable workmen, the court found that, as mutually understood, its retention was for the purpose only of suppressing highgrading and of insuring compliance with safety regulations so essential in underground work. Nor is the agreement of the lessees to perform in a minerlike manner of significance as evidencing an employee relationship. Such a provision, as well as the right of inspection, is almost invariably found in mining leases, even in those which contemplate the acquisition of the mine by the lessee. The lessor's supplying of tools is, of course, an evidentiary factor of weight. Offsetting this to a degree, the record shows that the leasers frequently bought extra equipment on their own account. The quality of the relationship is to be judged by the presence or absence of no single evidentiary factor, but by an over-all view.

■ The practice of leasing underground portions of mines obtains widely in the West. The custom is reputed to have been brought over by the excellent Cornish miners, and its pursuit by experienced men leads frequently to the accumulation of handsome profits. The typical leaser is the resourceful miner who prefers the speculative rewards, along with the risks, of operating on his own account. There was in the practice here no element of calculated tax avoidance. The taxpayer's leasing program was inaugurated years before the Social Security Act was placed on the books. We entertain no doubt that these leasers should be classed as independent contractors. We are not unmindful of the beneficent purposes of the Act, but the extension of its benefits to wider fields is not the business of the courts.

Affirmed.

---

done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee.

"Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees."