[Sac. No. 5680. In Bank. Apr. 23, 1946.]

EMPIRE STAR MINES COMPANY, LIMITED (a Corporation), Respondent, v. CALIFORNIA EMPLOYMENT COMMISSION, Appellant.

Robert W. Kenny, Attorney General, and Clarence A. Linn and Doris H. Maier, Deputies Attorney General, for Appellant.

Robert M. Searls and Lynne Kelly for Respondent.

H. Ward Sheldon as Amicus Curiae on behalf of Respondent.

EDMONDS, J.—The Empire Star Mines Company contracted with certain persons, on a royalty basis, to produce ore from various portions of its properties. Upon a ruling of the California Employment Commission that these persons were employees within the meaning of the Unemployment Insurance Act (Stats. 1935, p. 1226, as amended; Deering's Gen. Laws, 1939 Supp., Act 8780d), the mining company, under protest, paid the taxes imposed by that statute. The trial court held adversely to the state's construction of the contracts, and the commission has appealed from the judgment entered in conformity with that determination.

For many years, the respondent has operated the Empire-North Star group of mines in the Grass Valley Mining District of California. One of them, known as the North Star Mine, contains approximately 150 miles of underground workings. In 1929, when the company commenced to operate that property, it determined that the production of ore in some of the extensive tunnels far from the only available shaft would be commercially impracticable. The company also concluded that independent and experienced operators, with the incentive to make more than wages by skillful mining of the veins, and exercising much more care in the selection of ore than is customary in usual mining operations, could profitably work the remote ore bodies.

Accordingly, early in 1930, the company offered to lease certain of these areas in the mine. Such contracts were an old practice in the Grass Valley Mining District, the custom having been brought over from Cornwall many years ago. Prospective leasers investigated and sampled the areas for which contracts were offered and, following these examinations, many miners, usually on behalf of and in association with a group

of workers, executed leases of those parts of the mine which had been selected by them.

Except as to the descriptions of the areas leased, the terms of these contracts are substantially uniform. By the provisions of the agreements the lessees, who are referred to as leasers or tributers, for a period of six months were given the exclusive right to mine and carry on development work in a described area. The mining company agreed to furnish sufficient water and compressed air for operating machine drills and to supply the necessary track, tools, and drill steel; also, to hoist the ore and waste rock delivered by the leaser at the vertical shaft of the mine. A further agreement of the lessor was to place at the leaser's disposal the necessary facilities for the milling of the ores mined by him and upon retorting the amalgam and melting the bullion, to market the product.

In consideration of the lease of the mining rights and the facilities furnished by the lessor, the parties agreed that the company should retain, as a royalty, 50 per cent of the gross recovery from all ores mined by the leaser. But there was the condition that in the event the assay value of the concentrates was less than $60 per ton, the royalty might be increased by the lessor to a reasonable amount commensurate with the extraction costs, but, under such circumstances, the leaser was given the right to dispose of his portion of the concentrates.

The leaser agreed "to perform all work in good and minerlike manner, installing timber where necessary, and maintaining all workings in a safe condition; to furnish all explosives and fuse necessary for mining operations . . ., such explosives and fuse to be purchased from the Lessor at Lessor's cost, delivered at the mine." The leaser was given the right to carry on mining operations with workmen employed upon either a wage or profit-sharing basis but, without the consent of the company, he was limited to a working force of eleven persons. The lease expressly declared that there should be "no privity of contract between said Lessor and the employees of said Lessee, but that all business transacted under the terms of this lease shall be transacted by and in the name of said Lessee." The leaser assumed full and sole responsibility for the operation and direction of the work done under the lease; also, the contract specified that all persons employed "by the Lessee, whether it be on a wage or tribute basis, shall be deemed the employees of the Lessee, and not under any

circumstances the employees of the Lessor.'' The leaser was required to obtain with an insurance carrier and in an amount satisfactory to the mining company, adequate compensation insurance for himself and all workmen employed in any capacity in his operations under the lease.

Other provisions as to workmen were that although the mining company should have no part in the selection, employment or direction of the leaser's employees, upon written request, he agreed to discharge any employee whom the lessor's superintendent designated as objectionable. The leaser also agreed ''to use suitable precautions to prevent any theft of ore, amalgam or concentrates by anyone, whether connected with Lessee's operations or not. . . .''

The tramming, hoisting, storage and milling operations of the ore produced by the leaser were to be carried on in accordance with schedules set by the company. It reserved the right to enter the leased area ''to inspect work done in both underground and milling operations, for the purpose of determining the grade of ore being mined, the size and location of veins and the efficiency of milling operations.''

The leaser had the right, upon ten days' notice, to terminate the contract. After thirty days' notice, the lessor might do so for the failure of the leaser to perform the covenants of the lease on his part to be performed, if the operations were not financially profitable to the lessor, if the lessor should suspend all of its operations at the mine, in the event that the mine should be wholly or partially destroyed or rendered useless by fire, flood, or act of God, or upon the discovery of evidence by the lessor, through search or other means, that substantial amounts of ore, amalgam or concentrates were being stolen or not accounted for. The agreement was not assignable without the written consent of the lessor.

The leases executed in 1930 were extended, sometimes orally, for successive periods of six months. Other leases, substantially in the same form, were signed in 1935 and again in 1939. Under protest, the company paid to the federal government amounts demanded from it for taxes claimed to be due under titles VIII and IX of the Social Security Act, Act 1 (42 U.S.C.A. § 1004 et seq.). Suit was then commenced to recover the federal taxes. Meantime, early in 1940, the California Employment Commission made a demand upon the mining company for the payment of the tax which the Unemployment Insurance Act, *supra,* lays upon employers subject

to its provisions. The basis of this demand was that the company's leasers were employees and not independent contractors. Under protest the company then paid 3.7 per cent of the total amount received by the leasers.

In the federal litigation, the court held in favor of the mining company and following the affirmance of the judgment (*Anglim* v. *Empire Star Mines Co.,* 129 F.2d 914), the present action was commenced. In addition to a general denial of the allegations of the complaint regarding the status of the leasers, as a separate defense, the commission pleaded that claims for unemployment benefits had been filed with it by certain persons, each of whom asserted that he had rendered services for the company under a contract for hire and that such services constituted employment within the meaning of the Unemployment Insurance Act. The company was a party to the proceedings in connection with these claims, joined issue by denying that the services rendered constituted employment and introduced evidence in support of its position. Upon a finding that the claimants were employees and not independent contractors, the commission paid unemployment benefits. That decision was not judicially attacked, the answer asserted, and is final. Although the pleading does not identify these persons, the briefs disclose that the claimants were partners of leasers who had worked out and abandoned the portions of the mine contracted for by them. Before the trial, several actions to recover taxes paid under protest upon the amounts received by leasers of parts of other mines of the respondent under contracts in the same form as that which has been summarized, were consolidated with the present suit.

The evidence presented by the mining company in support of its claim for refund consists of a transcript of the record in the federal suit, introduced by stipulation of the parties, three additional leases and a statement of the taxes paid under protest. The mining company's manager of certain of its properties upon which leases were made and also its general manager appeared and testified. The amount of the leasers' earnings during the period for which taxes were paid was shown by tabulations of its accountant, verified by his testimony. No witness was called by the state, but in support of its separate defense, it offered the record of the proceedings before the California Employment Commission upon the claims of the persons who had worked for leasers. The court

sustained the mining company's objection to the introduction of this evidence and later granted its motion to strike out the separate defense.

Upon the issues of fact, the trial court found that as a "matter of practice, the leasers at all times have been entirely independent from any supervision, direction or control by the plaintiff [mining company] of the method, manner or details of the leaser's operations in the leased areas." The provisions authorizing the lessor to enter the leased areas and "to inspect work done in both underground and milling operations . . . did not give the plaintiff [lessor] the right to direct or control the means or methods by which the leasers conduct their mining operations." These conditions, the court found, were imposed to prevent ore stealing or "highgrading," to insure the leasers' compliance with safety orders of the California Industrial Accident Commission, to obtain information as to whether the leasers kept within the leasing boundaries, and to ascertain the possible direction of ore bodies in order to determine whether these veins might be found in areas of the mine other than those leased. The requirement that the work should be done "in a minerlike manner" for the due preservation of the mine and safety of all persons underground, said the court, is one customarily found in mining leases.

The mining company "had no right to control, nor has it exercised any control, of the means, details or methods by which the various lease groups conduct sorting and milling operations." Although the lessor's regular mill employees have, at the request of the leasers, assisted the lease groups in milling their ore, as to such operations, those employees were subject to the direction and control of the leasers who were charged for such services.

The provisions concerning tramming and storage operations of the ore and waste, as mutually interpreted by the mining company and the various leasers in practice, were not construed as giving to the corporation the control of, or the right to control, the details, manner or methods by which the leasers conducted these operations, but only the right to establish schedules by which such work might be carried out most conveniently. Such schedules were necessary to insure, for the various lease groups, an orderly and separate handling, treatment and storage of their ores, as well as to insure compliance with mine safety orders of the California

Industrial Accident Commission. By the terms of the leases the mining company "did not have the right to control. . ., nor did it in practice control or direct, or assert any control or direction over, the hours or number of shifts worked by the leasers, or the amount of ore extracted by the lease groups, or the selection or employment of the individual leaser associates or employees."

The provisions by which the leaser agreed to discharge any employee whom the company's superintendent designated as objectionable and the requirement for suitable precautions to prevent the theft of ore, amalgam, or concentrates were imposed "not only for the purpose of preventing . . . 'highgrading' but also to insure compliance by the leasers with the safety orders of the Industrial Accident Commission." As mutually construed in practice, this provision was not intended to give, nor did it give, to the lessor "the right to control the means, details, or methods of leasers' operations." Furthermore, said the court, "the company has never discharged, or asserted the right to request discharge of, any member or employee of any lease group." No contract was ever terminated by the lessor and the provisions allowing it to do so did not give the mining company control over the leasers' operations.

The provision that the leaser should purchase all explosives and fuse necessary for mining operations from the company and at its cost was to the advantage of the leasers because it effected a saving to them of approximately 20 per cent. Purchasing from the company also relieved the leasers from inconvenience and hazard in handling outside purchases of explosives and bringing them underground for storage purposes. In practice, this provision was not construed as obligating the leasers to purchase all materials and supplies from the company.

Concerning the division of the proceeds from the ore, the court found that the company "stored and shipped the bullion bars for each lease group separately and accounted separately to a designated representative of each lease group. . . ." It did not control or participate in, directly or indirectly, the apportionment of the payments for bullion bars among the members of any lease group. The members of each group shared in the profits of the mining operations. They participated in the selection of new associates or employees, in the determination as to the methods to be followed in the mining

operations, in deciding upon the basis for accounting between themselves, and in the selection or designation of a lease group representative. Except as to a few men who "were hired by the lease partners themselves," the company and the leasers considered the members in each lease group to be partners who were carrying on mining operations.

As conclusions of law, the trial court declared that the leasers were independent contractors and not employees of the mining company and that neither of them was liable for the payment of unemployment insurance taxes upon the earnings of the leasers from their operations. Judgment was accordingly ordered for the amount of taxes which had been paid.

As grounds for a reversal of the judgment the commission contends that the Unemployment Insurance Act, *supra,* is social legislation, as distinguished from a taxing statute, and must be liberally construed. The mining company had the right to completely control the leasers, hence under the common law rule, the contract established the relation of master and servant. But the courts, in construing the statute, are not bound by the rule of the common law; "they must search for and apply a distinction" which will accomplish the purpose of the legislation, and the decision in *Anglim* v. *Empire Star Mines Co., supra,* is not determinative of the present controversy. Furthermore, the argument continues, the ruling of the commission that the persons who claimed unemployment benefits were employees of the mining company is res judicata in the present action. In conclusion, the attorney general says, the trial court committed prejudicial error in refusing to accord the decision of the administrative board the weight to which it is entitled, and because the administrative ruling allowing benefits was not challenged by a proceeding in mandamus, the mining company is estopped from asserting in the present action that the leasers were not employees.

In response to these contentions, it is argued that neither under the lease agreements nor under common law rules were the leasers in employment within the meaning of the Unemployment Insurance Act, that the defense of res judicata is not applicable because the commission has no judicial power, that the present action is statutory, not in the nature of a review, and thus the cases in mandamus cited by the attorney general are not in point, and that the plea of estoppel

may not be availed of because the law requires the payment of benefits upon a referee's decision favorable to the claimant.

█ The objects and purposes of the Unemployment Insurance Act are not limited to the raising of revenue. It is a remedial statute and the provisions as to benefits must be liberally construed for the purpose of accomplishing its objects. (*California Emp. Com.* v. *Los Angeles etc. News Corp.*, 24 Cal.2d 421 [150 P.2d 186].) █ But there is no basis for the attorney general's contention that because the legislation confers benefits and also imposes taxes, the two parts of the law are inextricably connected. The taxing sections of the legislation are entirely separate from those concerning benefits, and although the benefits are paid from the amount collected as taxes imposed by the act, the provisions fixing liability for payments to the fund are to be considered accordingly.

█ The relationship contemplated by the legislation as the basis of the requirement for contributions is that of employer and employee; a principal for whom services are rendered by an independent contractor does not come within the scope of its provisions. (*Garrison* v. *State of California*, 64 Cal.App.2d 820, 824 [149 P.2d 711]; see *California Emp. Com.* v. *Bates*, 24 Cal.2d 432 [150 P.2d 192]; *California Emp. Com.* v. *Los Angeles etc. News Corp.*, *supra.*) █ In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. █ Strong evidence in support of an employment relationship is the right to discharge at will, without cause. (*California Emp. Com.* v. *Bates, supra; California Emp. Com.* v. *Los Angeles etc. News Corp., supra.*)

█ Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which

the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann. § 220.)

The trial court found that under the lease contract the leaser and not the lessor had the right to direct the work in the leased areas, and, as a matter of practice, at all times he was entirely independent from any supervision, direction or control by the mining company of the method, manner or details of the mining operations. The commission has not questioned the sufficiency of the evidence to sustain that or any other finding. The testimony shows that the men who were hired by the mining company worked in regular shifts. They were assigned to their working places by a shift boss and were told what to do, where to drill, just how to drill and frequently were told how much powder to load. The mucker was told what to pick out for waste, what to send to the chute for ore, what chute to use, where to pile the waste, and where to put rock walls.

The leasers carried on their operations quite differently. They determined for themselves, within the group, what work they would do, and how it should be done. They fixed their own working time. No leaser was ever requested to discharge anyone. Once, in the whole six-year period, the superintendent told a head leaser that one of his associates had persistently violated mine safety rules and suggested a two weeks' punitive lay-off of the offender which was carried out by the lease group to which the man belonged.

The foremen and shift bosses never visited the leasers' work. About once a month the company's safety engineer would go through the leased areas to see if the regulations of the Industrial Accident Commission were being carried out. He occasionally gave the leasers helpful suggestions but no orders. Occasionally a leaser would apply to one of the company's engineers for geological advice with respect to the vein he was following. Such help was always given as an accommodation. If a leaser had cross-cutting to do or other dead work in following a vein, he would sometimes hire men and pay their wages. The leasers directed the milling operations and, if they so requested, the size of the screens or the arrangement of the jigs was changed. All of these practices

are entirely inconsistent with an employer-employee relationship.

The provisions of the agreement giving the company the right of access to those portions of its mine which had been leased and to inspect work done in both underground and milling operations, as well as the requirement that the work should be well performed with suitable precautions to prevent the theft of ore, do not prove that the leasers were employees. On the contrary, as the court impliedly, if not directly, found, those demands tend to prove the relationship of principal and independent contractor. Unquestionably the mining company had a considerable interest in the suppression of highgrading, and was bound to see that there was complete compliance with safety orders of the Industrial Accident Commission. Other reasons which would prompt any lessor of mining property to insist upon the right of access are to afford a means of ascertaining whether the lessees kept within the boundaries specified in the agreement and to follow the direction of the ore bodies to other parts of the mine.

Also, in the operations of a large enterprise such as the Empire Star Mines, necessarily the tramming and storage of the ore produced by an independent contractor would have to be handled in accordance with schedules worked out for mutual convenience.

All of this evidence tends to prove that the leasers were carrying on mining activities at their own risk, in their own way, for their own profit, and places the trial court's findings to this effect beyond the reach of an appellate court. Although the language of the contract is not conclusive, it includes all of the essential elements of a mining lease. Of particular significance is the provision that the mining company could terminate the agreement only upon thirty days' notice and for specifically enumerated causes. As a matter of law, there is no condition or requirement which compels a determination that either the person designated as the leaser, or anyone working for him, was an employee of the corporation. The testimony concerning the conduct of the parties directly negatives an employment relationship, and taken as a whole, the evidence substantially, if not conclusively, supports the determination of the trial court that the leasers were independent contractors. As the Circuit Court of Appeals succinctly summarized its conclusions upon the same facts: ''The typical leaser is the resourceful miner who prefers the

speculative rewards, along with the risks, of operating on his own account. There was in the practice here no element of calculated tax avoidance. The taxpayer's leasing program was inaugurated years before the Social Security Act was placed on the books. We entertain no doubt that these leasers should be classed as independent contractors. We are not unmindful of the beneficent purposes of the act, but the extension of its benefits to wider fields is not the business of the courts." (*Anglim* v. *Empire Star Mines Co., supra,* at p. 917.)

The allowance by the commission of the claims of certain leasers to unemployment benefits upon a finding that the applicants were employees of the mining company is not determinative of the issue in the present action, as the attorney general contends. Perhaps, for the reasons stated in *Bodinson Mfg. Co.* v. *California Emp. Com.,* 17 Cal.2d 321 [109 P.2d 935], the mining company might have sued in mandamus to test the ruling upon the sole question of employment. However, the position of the Bodinson company was quite different from that of the respondent now before the court. In the Bodinson case, the claims of certain applicants for unemployment benefits were resisted upon the ground that, although these persons had been employed by the company for some time, they were ineligible for benefits under the statute because they left their work as the result of a trade dispute. The mining company insists that the leasers were not employed by it but operated as independent contractors.

But regardless of this difference, the Unemployment Insurance Act, *supra,* makes a clear distinction between procedures available to a person against whom a levy for contributions is made and the means specified for an applicant to secure a determination of his claim to benefits. The provisions concerning claims for benefits are found in article 6 of the statute. Under section 67 of this article, an applicant for benefits who asserts that he is unemployed but available for and able to work may have an initial determination "with respect to whether or not benefits are payable, the weekly benefit amount payable, and the maximum amount of benefits payable." Any employer whose reserve account may be affected by the payment of benefits to the applicant, is given the right to appear in the proceeding. Either the applicant or the employer may appeal from the initial determination and the

final ruling is reviewable by mandamus. (*Matson Terminals, Inc.* v. *California Emp. Com.,* 24 Cal.2d 695 [151 P.2d 202].)

Article 4 of the statute concerns "contributions," a euphemistic expression meaning tax exactions. Section 45.10 of this article gives to any person from whom a tax has been illegally collected upon the ground that he is an employer, the right to sue the commission for its recovery. The distinction between this cause of action and the right of an employer to contest, in an administrative proceeding and by judicial review, a claim for benefits has been clearly stated in *W. R. Grace & Co.* v. *California Emp. Com.,* 24 Cal.2d 720, 727 [151 P.2d 215], where it was held: "The superior court actions, which in the view of the commission and claimants abate the present proceedings, are suits to recover unemployment insurance contributions paid by the employers under protest, brought under authority of section 45.10 of the Unemployment Insurance Act. . . . The present petition for a writ of mandamus is to test the validity of the commission's decision that claimants are entitled to the benefits of the Unemployment Insurance Act in the form of payments or credit for the weeks of waiting period, and is in effect an appeal to the courts from a determination under section 67 of the act. An action under section 45.10 is entirely different, simply determining the propriety of the employer's contributions to the fund."

The article which specifies the procedure for the levy and collection of contributions includes section 41.1 which provides a remedy for an employer whose account is charged with benefit payments which he contends were illegally made. Under such circumstances, the statute reads, he may protest the charge but, pending a determination of the controversy, he is required to pay the tax. In the event of an adverse administrative ruling, he may then sue the commission to recover the asserted overpayment. But a determination that an applicant is entitled to benefits is not, as the attorney general insists, res judicata in an action brought under the provisions of section 45.10 for the recovery of contributions paid under protest upon the ground that the plaintiff is not an employer within the meaning of the statute. What was said in *Matson Terminals, Inc.* v. *California Emp. Com., supra,* at page 702, concerning the bar of an administrative decision upon the question of eligibility for benefits is applicable only to a later proceeding under section 41.1 for a determination

of the rate chargeable against the employer for a succeeding taxable period.

 This conclusion is in accordance with the general rule that the doctrine of res judicata may not be availed of in connection with the exercise of administrative powers. (*Olive Proration etc. Com.* v. *Agricultural etc. Com.*, 17 Cal. 2d 204, 208 [109 P.2d 918]; see: 30 Am.Jur., *Judgments,* § 164 and cases cited under note no. 16, p. 910.) For the defense of res judicata to operate as an estoppel there must be a judgment rendered by a court of competent jurisdiction. (*Panos* v. *Great Western Packing Co.*, 21 Cal.2d 636, 637 [134 P.2d 242]; *Edmonds* v. *Glenn-Colusa Irr. Dist.*, 217 Cal. 436, 439 [19 P.2d 502]; *Estate of Bell,* 153 Cal. 331, 339 [95 P. 372]; *Waterbury Sav. Bank* v. *Danaher* (1941), 128 Conn. 78 [20 A.2d 455, 461]; see: Freeman, *Judgments,* 5th ed., vol. 2, § 633.) The Employment Commission has no judicial power (*Bodinson Mfg. Co.* v. *California Emp. Com.*, *supra,* at p. 326; see: *Waterbury Sav. Bank* v. *Danaher, supra,* p. 461), and a decision of that body is of the same character as the one which was considered in *Waterbury Sav. Bank* v. *Danaher, supra.* In refusing to apply the doctrine of res judicata to a determination of Danaher as administrator of the Unemployment Act of Connecticut, the court held that the rule "is not applicable to the defendant's action as an administrative official in this case, but relates only to decisions rendered by a court of competent jurisdiction."

As a further ground for the reversal of the judgment, the commission argues that, under the rule stated and applied in *Dare* v. *Board of Medical Examiners*, 21 Cal.2d 790 [136 P.2d 304]; *Sipper* v. *Urban*, 22 Cal.2d 138 [137 P.2d 425]; *Madruga* v. *Borden Co.*, 63 Cal.App.2d 116 [146 P.2d 273]; *Vaughn* v. *Board of Police Commissioners*, 59 Cal. App.2d 771 [140 P.2d 130]; and *National Labor Relations Board* v. *Hearst Publications*, 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170], although it is the duty of a court in a trial following the finding of an administrative body to exercise an independent judgment upon the facts and the law, the challenged determination will not be disturbed if it is supported by substantial evidence. But the cases upon which the commission relies are not here in point. Those decisions concerned the procedure to be followed in mandamus or certiorari; the suit of the mining company is not a review of the administrative order but, for the reasons heretofore

stated, a statutory action having no connection with and independent of the commission's ruling upon the benefit claims. The trial court, therefore, correctly ruled in striking from the commission's answer the defense of res judicata and in sustaining the mining company's objection to the introduction in evidence of the record of the proceedings in which benefits were allowed.

The attorney general states that because the mining company did not attack by a proceeding in mandamus the administrative ruling allowing benefits the commission paid the claims. For that reason, he says, the mining company is estopped from asserting in the present action that the leasers were not employees. However, under the Unemployment Insurance Act, *supra*, upon the affirmance by a referee of an initial determination allowing benefits, ''such benefits shall be paid regardless of any appeal which may thereafter be taken.'' (§ 67.) Accordingly, the law required the payment of benefits even before the decision upon the administrative appeal prosecuted by the mining company. This provision is ''the very essence of the act.'' (*Abelleira* v. *District Court of Appeal,* 17 Cal.2d 280, 298 [109 P.2d 942, 132 A.L.R. 715].)

The judgment is affirmed.

Gibson, C. J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied May 20, 1946.