[L. A. No. 22799.   In Bank.   Nov. 13, 1953.]

M. H. ANGLIN, Respondent, v. ALLINE E. CONWAY, Appellant.

Wallace & Cashin for Appellant.

Donahue & Goldberg and R. C. Donahue for Respondent.

SPENCE, J. —Plaintiff, as assignee of eight separate claims for labor and services rendered, brought suit against Alline E. Conway, the estate of H. A. Conway, deceased, and George Harwood. The latter defendant was not served with summons. The defendant estate was found not to be liable, and judgment totaling $2,383.80 was entered only against defendant Alline E. Conway. She appeals on these grounds: (1) lack of proof of the assignment of the labor claims involved; and (2) insufficiency of the evidence to establish the employer-employee relationship between herself and respondent's assignors. Her position is not well taken on either point under the record, and accordingly the judgment must be affirmed.

The pleadings show respondent's allegation of the several assignments in question and appellant's denial thereof. The court found that the claims had been assigned as alleged. With two possible exceptions, respondent made no proof of the assignments, which fact appellant cites as a bar to respondent's recovery. (*Ford* v. *Bushard,* 116 Cal. 273, 276 [48 P. 119]; *Sterling Adjustment Co.* v. *Laher Auto Spring Co.,* 116 Cal. App. 100, 101 [2 P.2d 408].) There would be merit to this contention (Lab. Code, § 300) were it not for the actions and conduct of appellant's counsel in his opening remarks and during the course of the trial, leading respondent's counsel and the court to believe that there was no contest of the matter of assignment. The record shows the following colloquy at the outset of the trial:

"THE COURT: And this is an action on assigned claims for wages? MR. DONAHUE (Respondent's Counsel): Particularly labor, your Honor. THE COURT: And the defense is they were not contracted by this defendant. Is that correct? MR. WALLACE (Appellant's Counsel): That is correct, your Honor. MR. DONAHUE: In talking with counsel for this defendant, your Honor, he believes we can confine the issues in this case to the question of the liability of this named defendant—that is, his client . . . THE COURT: I presume that would be his endeavor, at least. MR. DONAHUE: Confine it to that rather

than first have to establish the accounts. . . . THE COURT: You mean, Mr. Wallace, that you are not prepared to contest the correctness of the items, but only the liability? . . . MR. WALLACE: . . . If there is no liability, the question of the accounts will not become material. . . . THE COURT: Well, let's go ahead with the issue, then."

During the course of the trial, one of the alleged assignors was interrogated as follows: "Q. (By Mr. Donahue): Now, you have assigned your claim against Alline E. Conway to M. H. Anglin. Did you not? A. Yes, sir. MR. WALLACE: I object to that. It calls for a conclusion of the witness. I will stipulate the purpose is he assigned his claim against—— THE COURT: In other words, it is his conclusion as to the effect of this legal document? MR. WALLACE: He signed a document. MR. DONAHUE: Well, it is just to identify this man as one of the parties in this action. MR. WALLACE: We are not going to quarrel with that. MR. DONAHUE: That is the only purpose of the question. THE COURT: All right. Let it stand."

In these circumstances appellant may not now controvert the accepted fact of assignment. (*Martin* v. *Going,* 57 Cal. App. 631, 633-634 [207 P. 935].)

There now remains the question of the sufficiency of the evidence to establish the employer-employee relationship between appellant and respondent's assignors.

By an agreement dated August 22, 1949, H. A. Conway, appellant's husband, obtained from a Mr. and Mrs. Bolling the right to exploit certain property in Kern County for oil. The agreement was signed and acknowledged by Conway on September 7, 1949, in Colorado, and it was recorded in Kern County on September 15th. By its terms Conway undertook to furnish all supplies and all things necessary for the drilling of an oil well. Harwood, whose interest in oil activities was known to the Conways by reason of other business dealings and associations, then proceeded with the operation—moving equipment onto the property and employing one Rivers as superintendent, who, in turn, hired the various workmen here involved. The log of the well, kept by Rivers and some of the workmen, showed the "rigging up" commenced on August 29th and the drilling continued under the name "H. A. Conway, 722 Crescent Drive, Beverly Hills, Cal." The well was drilled to a total depth of 2,873 feet; by September 15th it was obvious that the hole was dry, and all work ceased within a few days thereafter. The labor claims in question

remained unpaid. All the payroll records and tax statements signed during this period by the respective workmen gave the employer's name as H. A. Conway, with his address in Beverly Hills. A notice of nonresponsibility was posted and recorded by the Bollings on August 30th, stating that they had entered into a contract with H. A. Conway for the purpose of drilling a well on the premises described, and that one George Harwood was associated with H. A. Conway in the performance of the contract. There is no evidence that Conway ever visited the property or knew anything about the transaction other than signing the contract. He was in Colorado during this period working on location for a movie studio. About September 12th he became ill and returned to Los Angeles, where he died on November 15th.

On September 4, 1949, appellant visited the well and according to several of the workmen who testified at the trial, Harwood introduced her to them as "the boss," the "one that was putting up the money" for their wages and the drilling expenses. On that day appellant wrote a number of checks on her personal bank account for wages due the employees, totaling approximately $1,000. At that time appellant also wrote a couple of checks for material bills, which she gave to Rivers for delivery. Rivers testified that she made several trips later to the well; that on one trip about September 12th, when he told her that he was worried about money for the men and the casing, she said, "In just a few days we will have money, and we will have casing, and we will complete the well," and that Harwood "verified" her statement; that on another occasion when she was there shortly after the well shut down on September 22d, she gave him a check to repair the pump because he "figured [to] start up any day and [would] need the pump right away"; that he kept calling her home almost daily about paying the men, and she promised to get the money to him and told him "to keep the men out there." Rivers also testified that appellant on some of her later trips brought different men with her in an evident attempt to find someone to "take the well over" and "put up the money to clear the debts"; that about a month after the well shut down, he with some of the workmen and appellant went to the district attorney's office in Bakersfield to talk over the matter of some labor checks which Harwood had given which were not paid; that appellant then told the district attorney that Harwood had agreed to furnish the rigging and her only obligation was to pay the labor; that she said

that she had given Harwood about $1,200 for that purpose but that he failed to deposit it. In further testimony, Rivers stated that Harwood employed him for $700 per month; that Harwood gave him at various times sizable cash amounts for equipment and "stuff for the rig" but never paid him any wages; that appellant told him (Rivers) "I will see you get yours."

Various workmen testified that appellant told them at different times when she visited the well that "she would see all the boys got their money for working." One of the workers testified that he and another laborer called on appellant at her Beverly Hills home sometime toward the end of October to ask her "what she intended to do about the labor bills" that had accumulated; that she said, "Boys, I want to tell you how I got into this thing——"; that she then stated that under her agreement with Harwood she was to be responsible only for the labor, that the materials to drill the well and the machinery were to be furnished by "other parties"; that she understood that the "well would be completed in a lot less time than it was" and that "was why she didn't have sufficient money to pay off the wages right then"; that she thought "oil would be removed" upon completion of the well and "therefore they would easily get backing for the rest of the wells" which had been staked out for drilling; that the "labor bill got staggering and she said she didn't have money to cover" it; that he then told appellant how much he claimed to be due him, and she made no objection to the amount but said, "I am going to pay all you boys." Another workman testified that the day after he quit toward the end of September, he telephoned appellant and told her "all the men were going to quit," and she replied, "tell them to hang on a few days. Harwood and I are going to get some money. I will get money, and we will be up and pay them off."

In connection with appellant's interest in the enterprise, Rivers testified that she had told him during the course of operations that "she was engaged in drilling the well and was going to make a present of" it to her husband, H. A. Conway. It further appears that appellant was ordered by the court through the issuance of a subpoena duces tecum to produce her records relative to all transactions pertaining to the oil well, including all cancelled checks and books of account covering the period of drilling operations, but appellant refused to comply. In the course of the trial the

court, after reference to appellant's failure to produce the documents as subpoenaed, undertook, without success, to elicit from appellant information as to her financial condition and bank statements for the specified period.

It is true that appellant gave testimony which contradicted and tended to explain some of the evidence given by respondent's witnesses. ■ The question of the credibility of the witnesses, however, was one for the trial court to determine (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557]), and that court undoubtedly considered appellant's failure to comply with the subpoena duces tecum in evaluating her testimony. ■ When an appellate court is confronted with the question of the sufficiency of the evidence, its only duty is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support the findings and judgment. ■ The foregoing review of the record clearly shows that there was abundant evidence from which the trial court could have concluded that despite the signing of the agreement solely by Mr. Conway, appellant was either the sole undisclosed principal or one of the undisclosed principals in the oil venture, and therefore primarily liable for the labor claims. That she so considered herself liable for such claims is shown by her own admissions, to which respondent's witnesses testified. She had control of the purse in making available the funds to meet the workmen's claims, and it was not necessary that she be concerned with all the details of the employment in order to establish the employer-employee relationship between herself and respondent's assignors. (*Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43 [168 P.2d 686].) Under these circumstances appellant's cited authorities involving the requirement of the statute of frauds that a third person's agreement to pay the debts of another must be in writing (Code Civ. Proc., § 1973, subd. 2; Civ. Code, § 1624, subd. 2; *McClenahan* v. *Keyes*, 188 Cal. 574 [206 P. 454]; *Swim* v. *Juhl,* 72 Cal.App. 363 [237 P. 552]) are not in point.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.