[Civ. No. 27620.  Second Dist., Div. Two.  Nov. 13, 1964.]

ALADDIN OIL CORPORATION, Plaintiff and Appellant, v. IRVING PERLUSS, as Director of the Department of Employment, et al., Defendants and Respondents.

604

Milton A. Krug, Marvin A. Freeman and Ivon B. Blum for Plaintiff and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Dan Kaufmann, Assistant Attorney General, and Richard S. Cohen, Deputy Attorney General, for Defendants and Respondents.

HERNDON, J. — Plaintiff corporation appeals from the judgment of the superior court in favor of the defendants and respondents, Irving Perluss, former Director of the Department of Employment of the State of California, and the Department of Employment of the State of California, rendered in an action brought by appellant to recover unemployment insurance contributions, interest and penalties totaling $3,066.15 which it had paid under protest following an assessment made for the period April 1, 1956 through March 31, 1958.

Appellant's claim for refund is based upon its contention that its relationship to certain "leasemen" engaged by it was not such as to bring it under the provisions of the Unemployment Insurance Code relating to employer contributions, and that the sums paid to its vice president were not wages but were either in the nature of advance royalties or trust funds which were not subject to tax under the code.

Appellant does not assert that the findings of fact made by the trial court do not support the judgment although it

is critical of the wording of certain of them and feels that certain other findings requested by it should have been made. We deem it unnecessary to engage in any extended discussion of these subsidiary arguments for it is apparent that the findings provide a sufficient determination of the ultimate facts necessary to support the judgment.

Essentially, appellant's basis for urging a reversal herein is its contention that the findings are not supported by the evidence and the reasonable inferences to be drawn therefrom, and that this court must hold as a matter of law that the disputed status of its vice president and its ''leasemen'' was *not* that of employer and employee as this relationship has been defined by controlling decisions.

We shall first consider the status of the challenged ''leasemen.'' A ''leaseman'' appears to be simply a person who engages in negotiating and acquiring oil and gas leases from various landowners. Since appellant asserts that there are only 50 ''contract'' leasemen in all of California, it is apparent that most persons engaged in this line of work are employed by major oil companies as employees. Appellant describes a contract leaseman as a person who engages in the acquisition of oil and gas leases for the account or accounts of various independent producers and, in addition thereto, also negotiates and acquires oil and gas leases for his own account which he then sells to a producing oil and gas company at a profit. It is, therefore, apparent that whether the relationship of a person engaging in this line of work to the company using his services is that of an employee, an independent contractor or a wholly private entrepreneur is dependent upon the factual circumstances surrounding the particular engagement.

The evidence presented in the instant case on this subject, viewed in the light most favorable to the judgment, may be summarized as follows: Appellant corporation was an independent oil producer engaged in the business of acquiring oil and gas leases, drilling wells and producing crude oil. During the period involved herein, appellant was interested in acquiring oil and gas leases on a large number of individual properties located in two specific areas or districts of the City of Los Angeles. In order to accomplish its objective appellant entered into similar oral arrangements with various oil and gas leasemen. The substance of these arrangements was as follows:

Appellant gave each leaseman a supply of oil and gas leases in respect to which the leaseman's sole assignment was

to acquire for the appellant merely the signature of the individual landowner designated on the particular lease. The oil and gas leases were acquired in the name of Hilo Oil Company, which company was the agent of the appellant. The leases acquired by the leasemen were transferred immediately from the Hilo Oil Company to appellant.

The various leasemen had no right or privilege, under their oral arrangement with appellant, to vary the terms of the leases in any way whatsoever and had nothing to do with the drafting of the lease forms. In fact, appellant had filled in on each lease the legal description of the property and the name and address of the landowner. The only blank left on a lease when it was given to a leaseman was the place where the landowner was to sign. The appellant had the right under the terms of its oral arrangements with its various leasemen to terminate their work at any time without notice, without cause, and without incurring financial responsibility and, likewise, the leasemen had the right to terminate their relationship with appellant without notice and without cause.

Under their oral arrangements with appellant, each leaseman was paid $25 per day, and reimbursed by appellant at the rate of 8 cents per mile for the use of his automobile, and all costs expended by him for dinner, telephoning, parking, using the services of a public stenographer and purchasing fiberboard filing cabinets in which he kept the oil and gas leases assigned to him. In order to be reimbursed by appellant for the costs incurred by each leaseman in securing the signatures on the uniform oil and gas leases it was required that he submit to appellant a statement setting forth specifically the expenses incurred by him.

One of appellant's leasemen testified that, pursuant to his oral arrangement with appellant, he was required to make a written report to appellant every three or four months with respect to the status of the oil and gas leases in his possession. A number of the leasemen thought that their oral arrangements with appellant made them the appellant's employees.

The oral arrangements between appellant and its leasemen were to run for an indefinite period of time. They provided that the leasemen could acquire leases for their own accounts or for the accounts of other third persons. However, the leasemen were not allowed under their oral arrangements with appellant to acquire leases for themselves or other third parties in the same area and at the same time as they were acquiring leases for appellant.

Leasemen testified that in their conversations with appellant's vice president regarding their employment as leasemen there were no conversations as to what control would be exercised over their activities by appellant or its officers, that there was no mention in these conversations of the minimum number of hours per day or the average number of hours per day they should spend working for appellant, nor was there any mention in the conversations as to the number of signed leases they were required to have. In this regard, one of appellant's leasemen answered the following question on respondent's questionnaire:

"12. Is the individual required: (a) To report in person to the firm or its representatives? (b) To report in writing or by telephone to the firm or its representatives? Answer: 'Either.' "

The evidence with respect to the conduct of the parties is as follows: Each leaseman was supplied with a business card by appellant. The leasemen used this card when they called on a landowner in behalf of appellant. An example of a card furnished to a leaseman by appellant is as follows:

"Representing
"HILO OIL COMPANY
"Land Department

"CHARLES DUKE

CR 62609
Suite 309, 232 North Canon Drive
Beverly Hills, California."

Invariably an introductory letter was sent by the appellant to each of the various landowners informing him that a representative of its Land Office would be calling on him in the near future with respect to the acquisition of an oil and gas lease on his property. An example of such a letter follows:

"October
"Twenty-second
"1958

"Mr. J. Miller
"629 South Sycamore
"Los Angeles, California

"In re: Lot 354, Tract 5049

"Dear Mr. Miller:

"This company, in association with the Universal Consolidated Oil Company of Los Angeles, is presently engaged in

acquiring subsurface oil and gas leases in the vicinity of the above noted property.

"A representative of our Land Office will call upon you shortly in this regard, and we should appreciate any courtesy you may extend him.

> "Yours truly,
>
> "Hilo Oil Company
>
> "By_____
>
> "M. METZENBAUM — Land Dept."

One of appellant's leasemen answered the following question in this manner: "14. Is there a foreman, supervisor, manager, etc., responsible for directing, supervising, verifying, or reviewing the individual's services for the firm? [A.] : *Manager, Land Department*—If so, please identify by name and title of position. [A.] : Murray Metzenbaum."

Another of appellant's leasemen testified that while he was working for appellant he regarded appellant's vice president as being the manager or supervisor of its Land Department. Another of the leasemen testified that he personally returned his signed leases to the office of appellant every three, four or five days. Another of appellant's leasemen testified that he dropped into the office of appellant every day or two or three days in order to pick up telephone calls he might have received.

Each leaseman testified that when he was in the office of appellant he was asked by appellant's vice president what conditions were like in the area where the leaseman was working, the number of leases that he had acquired, and the reaction of the people in the area where he was working.

The leasemen testified that they received telephone calls at the appellant's office, made use of the telephones in appellant's office, and used the stenographic help of appellant in writing business letters. The majority of the leasemen had an office in their homes, but some of the leasemen did have offices separate and apart from their homes. One of appellant's leasemen testified that if one of the appellant's other leasemen had difficulty in acquiring a signature on a particular lease, that lease would be turned over to him so that he might secure the necessary signature.

It appears almost beyond reasonable dispute that the trial court reasonably could infer from the foregoing evidence that the leasemen engaged by appellant in the instant proceeding

obtained the status of "employees" as that term is used in the Unemployment Insurance Code.

■ "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183].)

■ It is also to be noted that in actions for refunds of taxes the burden of proof is upon the taxpayer-plaintiff. (*Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34, 38 [180 P.2d 11].) ■ The primary factors to be considered in determining whether a particular relationship is within the terms of the Unemployment Insurance Code were set forth in *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43-44 [168 P.2d 686], as follows:

"The relationship contemplated by the legislation as the basis of the requirement for contributions is that of employer and employees; a principal for whom services are rendered by an independent contractor does not come within the scope of its provisions. [Citations.] ■ In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. ■ Strong evidence in support of an employment relationship is the right to discharge at will, without cause. [Citation.]

■ "Other factors to be taken into consideration are (a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of

work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. [Citation.] ''

As a guide to the application of these principles, it is helpful to compare the factual situations presented in the two cases filed on the same date as the *Empire Star Mines Co.* case, *supra*, and also authored by Justice Edmonds. In *Briggs* v. *California Emp. Com.*, 28 Cal.2d 50 [168 P.2d 696], as in *Empire Star Mines Co.*, the disputed relationship was held not to be that of employer-employee, whereas in *Twentieth etc. Lites* v. *California Dept. of Emp.*, 28 Cal.2d 56 [168 P.2d 699], the required relationship was found to exist. Regarding the importance of the right to discharge at will in support of an employment relationship, the court, in *Malloy* v. *Fong*, 37 Cal.2d 356, 370 [232 P.2d 241], stated:

''Whether a person performing work for another is an agent or an independent contractor depends primarily upon whether the one for whom the work is done has the legal right to control the activities of the alleged agent. [Citation.] The power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities. 'The right to immediately discharge involves the right of control.' [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent. The existence of the right of control and supervision establishes the existence of an agency relationship. [Citation.] . . .'' (See also *Isenberg* v. *California Emp. Stab. Com.*, *supra*, 30 Cal.2d 34, 38-39; *Press Pub. Co.* v. *Industrial Acc. Com.*, 190 Cal. 114, 121 [210 P. 820]; *Bevan* v. *California Emp. Stab. Com.*, 139 Cal.App.2d 668, 683 [294 P.2d 524]; *Garrison* v. *State of California*, 64 Cal.App.2d 820, 824-825 [149 P.2d 711].)

On its facts the case most similar to the instant proceeding is *Twentieth etc. Lites* v. *California Dept. of Emp.*, *supra*, 28 Cal.2d 56, 57, which presents a remarkable parallel.

''. . . The business of the corporation is the manufacture and sale of neon advertising signs. The salesmen solicited orders for these signs and, after ascertaining the desires of a prospective customer, submitted a rough sketch of the proposed display to the company's art department which prepared drawings and estimated the cost of the installation. . . .

"If the company's design and price was [*sic*] accepted by the prospect, the salesman obtained from the customer a signed order on a form furnished by the appellant. The salesmen signed these forms as representatives of the company, but it reserved the right finally to accept or reject an order. Also, the company . . . paid the salesmen commissions only upon accepted contracts. Requested changes in the installation or adjustments as to price could not be made by the salesmen without the company's approval. . . .

"The salesmen were furnished desk space and telephone service in the company's office. Each of them used cards indicating that he was its representative, . . . Salesmen were not required to report regularly to the company's office, but they generally did so either by telephone or personally. . . .

"The salesmen had the right to take their orders to other companies engaged in the same business, but in general practice Twentieth Century was offered the first opportunity to make the sale or lease. They were free to work for others or to devote as much time as they desired to other business activities, whether in competition with the appellant or not. . . .

". . . They were not required . . . to produce a minimum amount of business, nor to work fixed or regular hours. Their services were terminable without liability at the will of either party.

"Not all of the salesmen had written contracts. However, one such agreement received in evidence provided [among other provisions] . . .

". . . that the salesman was not to be restricted as to territory, time or method of sale, time devoted to the business, or the volume of business, nor required to submit reports of activities except as to completed deals. . . . Concerning the relationship of the parties, the contract provided that in any action at law, the salesman should be construed to be a subagent only with respect to customers for whom services were performed and otherwise deemed to be an independent contractor and not a servant, employee, joint adventurer or partner of the company."

In affirming the decision of the trial court, the Supreme Court said at page 60: "The factors to be taken into consideration in determining whether one who performs services for another is an employee or independent contractor are stated in *Empire Star Mines Co.* v. *California Emp. Com., ante,* p. 33 [168 P.2d 686]. Those principles are determinative of the present controversy. It reasonably may be inferred from the evidence presented to the trial court that

the salesmen were subject to the control of the company. The company had the right to terminate their services at will without cause. To some extent it restricted the salesmen's work to certain prospective customers. Every order for the sale or lease of a sign was subject to the company's approval. Changes in the design or plan of installation or adjustments as to price could not be made by a salesman without the company's approval. The written contract provided that the salesman was to work diligently for the advancement of the company's business and to regulate his habits so as to increase the good will and reputation of the company. Conformity with all rules and regulations pertaining to the business was required. Another factor tending to prove an employee status is that the salesmen were not engaged in a distinct occupation but carried on the regular business of the company which supplied them with some of the tools necessary to do this and with a place to work. And although different inferences may be drawn from the uncontradicted evidence, both the commission and the trial court found in favor of the employer-employee relationship.''

Regarding the position of its vice president, Murray Metzenbaum, appellant makes two contentions. First, appellant contends that its vice president was not its employee, but that for all purposes appellant was merely the nominee or agent of its vice president. Second, appellant contends that the remuneration received by its vice president from appellant was not wages but advance royalties.

Aladdin Oil Corporation, the appellant, duly filed its Articles of Incorporation with the Secretary of State of the State of California late in the year 1953. Appellant had officers, such as a vice president and an assistant treasurer, who transacted business for the appellant. After its incorporation, appellant's name appeared on its office door, and also on the building directory where its office was located. Also the name and telephone number of appellant appeared in the telephone book. Appellant also had engraved letters or stationery at the top of which appeared its name and also its office address. The stationery with appellant's name and office address on it was used to carry on the appellant's business correspondence. In fact, in all communications with the respondent in respect to this case appellant used its engraved letterhead with its name and office address at the top.

During the period involved herein, appellant paid its leasemen, including its vice president, on its own bank checks

and did not use the personal checks of its vice president for this purpose. In addition, appellant bought supplies and equipment that it needed in its own name and not the name of its vice president. All the foregoing facts support the trial court's finding that appellant was a separate legal entity and the employer of its vice president Murray Metzenbaum.

Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations. (*California Emp. Com.* v. *Butte County etc. Assn.*, 25 Cal.2d 624, 637 [154 P.2d 892]; *Evelyn, Inc.* v. *California Emp. Stab. Com.*, 48 Cal.2d 588, 590 [311 P.2d 500].)

There is substantial evidence in the record to support the trial court's finding that appellant's vice president was appellant's employee receiving remuneration from the appellant which was subject to contribution under the provisions of the Unemployment Insurance Code.

Mr. Coleman, one of the respondent's auditors, testified with respect to appellant's vice president, as follows: "Q. Mr. Coleman, in connection with your audit, what did the books and records which were turned over to you by the accountant who has already testified, what did they show with respect to payments to Mr. Metzenbaum? MR. COLEMAN: A. The records reflected payments totaling in a monthly basis substantially the same ratio as other lease men were receiving for the same period of time. A. Did you have a conversation with Mr. Metzenbaum regarding whether or not he had secured leases during the period herein involved? A. Yes, sir. He advised me that on occasion he also had gone out and secured some of these leases." Mr. Metzenbaum, appellant's vice president, testified: ". . . Mr. Metzenbaum, in pursuance of that agreement, acquired himself for certain leases—that is, I negotiated certain leases and under our agreement or arrangement, I was entitled to be paid for those leases on the basis of time and expense put in . . . .

". . . I could do the work myself or engage the services of other independent men, contracting lease men. . . ." Mr. Garfinkel, appellant's witness, testified that: ". . . In fact, of my own knowledge, I know that he [Metzenbaum] was out in the area leasing, himself, in the evenings and doing considerable title work, I might add, in the town lot area."

It is clear from the evidence that appellant's vice president performed the same services with respect to acquiring

oil and gas leases for appellant as did its other leasemen involved herein, that for his services he was paid by appellant on its own checks on the same basis as the other leasemen of appellant, i.e., time and expense incurred by him in acquiring the signatures on the leases, and that therefore he was properly found to be the employee of appellant.

The judgment is affirmed.

Roth, P. J., and Kincaid, J. pro tem.,* concurred.

A petition for a rehearing was denied December 2, 1964, and appellant's petition for a hearing by the Supreme Court was denied January 27, 1965. Mosk, J., did not participate therein.

_____
*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.