Filed 11/20/20 (unmodified opn. and 11/4/20 mod. order attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CORNERSTONE REALTY ADVISORS LLC et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> SUMMIT HEALTHCARE REIT, INC., et al. <br><br> Defendants and Appellants; <br><br> WINGET SPADAFORA & SCHWARTZBERG, LLP, <br><br> Objector and Respondent. | G057176 <br><br> (Super. Ct. No. 30-2014-00714004) <br><br> ORDER MODIFYING OPINION AND DENYING MOTION FOR LEAVE TO INTERVENE; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on October 28, 2020 be modified as follows:

1. On page 9, delete the heading "*False Declaration*" to subpart C. and replace it with "*Nuutinen Declaration*."

2. On page 9, fourth full paragraph, delete the sentence "Nuutinen made false statements in his declaration."

3. On page 9, fourth full paragraph, third sentence, delete "The truth" and replace it with "This information" so that the sentence reads:

This information was learned in the deposition of the person whom Plaintiffs had designated as most knowledgeable—Terry Roussel, the founder and majority owner of both CRA and CVI.

The modifications do not change the judgment.

The motion by Arto J. Nuutinen for leave to intervene to request modification and/or depublication of opinion is denied.


FYBEL, J.

WE CONCUR:


_____
ARONSON, ACTING P. J.


THOMPSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CORNERSTONE REALTY ADVISORS, LLC, et al., <br><br>    Plaintiffs and Respondents, <br><br>      v. <br><br> SUMMIT HEALTHCARE REIT, INC., et al., <br><br>    Defendants and Appellants; <br><br> WINGET SPADAFORA & SCHWARTZBERG, LLP, <br><br>    Objector and Respondent. | G057176 <br><br> (Super. Ct. No. 30-2014-00714004) <br><br> ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on October 28, 2020 be modified as follows:

1. On page 2, first sentence of the fourth full paragraph, add the word "be" before the word "summarized" so the sentence reads:

The facts and history leading to the terminating and monetary sanctions, though long and complicated, can be summarized as follows.

2. On page 22, fourth sentence of the third full paragraph, change the word "connections" to "connection" so the sentence reads:

The relevant statute, Civil Code section 1794, subdivision (d), allowed recovery of attorney fees "'based on actual time expended'" in an amount determined by the court "'to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action.'"

3.  On page 29, first sentence of the third full paragraph, add the word "had" before the word "incurred" so the sentence reads:

Defendants argue the trial court erred by failing to include in the sanctions award the $96,630.83 in attorney fees they had incurred in preparing for trial.

The modifications do not change the judgment.


FYBEL, J.

WE CONCUR:


_____
ARONSON, ACTING P. J.


THOMPSON, J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CORNERSTONE REALTY ADVISORS, LLC, et al.,<br><br>    Plaintiffs and Respondents,<br><br>              v.<br><br>SUMMIT HEALTHCARE REIT, INC., et al.,<br><br>    Defendants and Appellants;<br><br>WINGET SPADAFORA & SCHWARTZBERG, LLP,<br><br>    Objector and Respondent. | G057176<br><br>(Super. Ct. No. 30-2014-00714004)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman, Judge.  Affirmed in part, reversed in part, and remanded.

Thompson Coburn and Helen B. Kim for Defendants and Appellants.

No appearance for Plaintiffs and Respondents.

Winget Spadafora & Schwartzberg, Timothy W. Fredricks and Jared M. Ahern for Objector and Respondent.

\*          \*          \*

## INTRODUCTION

The trial court concluded that the plaintiffs in this action had violated several court orders requiring them to produce critical financial documents and, pursuant to Code of Civil Procedure section 2023.030, imposed well justified terminating and monetary sanctions for their discovery abuses. Imposition of terminating sanctions, though significant, is not the subject of this appeal; indeed, plaintiffs' appeal challenging the terminating sanctions has been dismissed.

The subject of this appeal is the monetary sanctions imposed by the trial court, and the appeal is pursued by defendants, the parties that sought and received those sanctions. Defendants were awarded over $586,600 in sanctions on top of terminating sanctions, yet contend the trial court did not award them enough to cover their attorney fees and costs incurred as a result of plaintiffs' discovery abuses and erred by not making plaintiffs' trial counsel jointly and severally liable for the monetary sanctions imposed.

*The Parties*

Plaintiffs/Respondents are Cornerstone Realty Advisors, LLC (CRA) and Cornerstone Ventures, Inc. (CVI), referred to collectively as Plaintiffs. Plaintiffs have not filed a respondent's brief. Respondent Winget Spadafora & Schwartzberg, which was counsel for Plaintiffs during most of the trial court litigation, is referred to as WSS. Defendants/Appellants are Summit Healthcare REIT, Inc. (Summit), Paul L. Danchik, Daniel Johnson, Dominic Petrucci, Kairos Partners, Inc., and Kent Eikanas. Defendants, when referred to collectively, are called Defendants. Throughout the litigation in the trial court, Eikanas had separate counsel from the other defendants, but litigation actions significant to this appeal were taken or joined in by all Defendants.

*Summary of Facts Leading to Sanctions*

The facts and history leading to the terminating and monetary sanctions, though long and complicated, can summarized as follows. Defendants sought production of CRA's and CVI's financial and accounting records, including their general ledgers.

2

Those records were critical to Plaintiffs' complaint and Defendants' cross-complaint. Plaintiffs had access to the financial and accounting records sought by Defendants, and could and should have produced them forthwith without objection or delay. Instead, Plaintiffs carried out a protracted and costly campaign of discovery abuse, which included disobeying several court orders to produce the documents, with the successful aim of never, ever, producing the requested documents. The trial court responded to this history of misconduct by imposing monetary sanctions of $586,600 and ordering Plaintiffs' complaint be dismissed as a terminating sanction.

*Questions on Appeal and Conclusions*

The questions for us are whether the trial court should have imposed a larger amount of monetary sanctions against Plaintiffs and whether the court should have made WSS jointly and severally liable for those sanctions.

As to the first question, we conclude that, with one exception, the trial court's decision to impose monetary sanctions in the amount of $586,600 is consistent with the relevant law and principles governing discovery sanctions and is a reasonable exercise of the court's discretion. Of the principles governing discovery sanctions, three—the principle of compulsion, the principle of causation, and the principle of reasonableness—are relevant here and guide our decision. Although Defendants had requested over $2 million in monetary sanctions, the trial court was not required to accept that figure, and had the authority and the duty under these principles to determine for itself the reasonable amount of attorney fees resulting from the misuses of discovery to impose as monetary sanctions. The amount of monetary sanctions awarded, while substantially less than the amount requested, was three times greater than that recommended by the discovery referee. We reject Defendants' assertion that the trial court acted arbitrarily and shirked its duty in setting the amount of monetary sanctions.

As to the second question, we conclude substantial evidence supports the trial court's finding that WSS did not advise the misconduct resulting in the discovery

3

sanctions. The trial court read and considered the discovery referee's report, which had recommended making WSS liable for the monetary sanctions, but exercised its authority to reach a different conclusion based on the court's own assessment of the credibility of the declarants and the weight of the evidence. The court did not err in so doing.

## FACTS AND PROCEDURAL HISTORY

### I. Events Leading to This Litigation; the Pleadings

Summit is a publicly registered, non-traded real estate investment trust. Defendants Danchik and Johnson are members of the Summit board of directors, Petrucci is Summit's chief financial officer, Kairos Partners, Inc. is Petrucci's company, and Eikanas is Summit's president.

CRA was Summit's advisor and asset manager pursuant to an advisory agreement. CRA had no employees of its own and relied upon CVI to provide office space and employees to perform CRA's obligations under the advisory agreement. CVI was the managing member of CRA's managing member, Cornerstone Industrial Properties (CIP).

On March 17, 2014, Summit gave CRA 60-days' written notice of its intent to terminate the advisory agreement, as it permitted. Two weeks later, several CVI employees resigned when the company failed to meet payroll. The next day, Summit hired some of these former CVI employees in an effort to avert the disruption that might arise from CVI's inability to continue to provide services for Summit. That same day, Plaintiffs, represented by WSS, commenced this lawsuit by filing a complaint against Defendants.

The complaint asserted causes of action for declaratory relief, breach of contract, tortious interference with contractual relations, intentional and negligent interference with prospective economic advantage, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and unfair competition. The gist of the complaint was

4

that Summit and the other defendants were carrying out a conspiracy to "suffocate and cripple CRA's and CVI's cash flow and business operations in order to render them insolvent and unable to pay their employees/agents and meet their financial obligations."

Defendants filed a cross-complaint against Plaintiffs, and others, for breach of contract, conversion, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, accounting, and indemnification. The cross-complaint alleged that Plaintiffs had failed to reimburse Summit for various organizational and operating costs, management fees, and operating expenses as required by the advisory agreement, and that CVI had converted over $13,000 that Summit had paid CVI to cover rent.

## II. Defendants' Discovery Requests

In May 2014, just a little over a month after Plaintiffs had filed their complaint, Summit served CRA and CVI each with a set of requests for production of documents. Summit asked for CRA's and CVI's financial records, data, and information, including documents related to "cash flow and business operations," "financial conditions," "financial statements or compilations," and "accounts payable" for the period from January 1, 2009 to "the present." Summit defined the term documents to include "data processing files and other computer-readable records or programs." CRA and CVI each served a verified response representing that all responsive and nonprivileged documents in their custody, control, or possession would be produced.

In September 2014, Summit served a second set of requests for production of documents on both CRA and CVI. The second sets requested "all accounting records" of CRA and CVI relating to Summit from January 1, 2009 to "the present." WSS, as counsel for Plaintiffs, objected to the requests as "overbroad and unduly burdensome," "burdensome and oppressive," "not reasonably calculated to lead to the discovery of admissible evidence," and seeking information "equally available to or within the

possession or control or knowledge of Defendants." Both CRA and CVI responded that no documents would be produced.

Eikanas propounded on CRA special interrogatories asking, among other things, that it identify the amounts that Summit had paid or reimbursed Plaintiffs for various expenses from March 2013 through March 2014. The interrogatories asked CRA to identify all documents supporting its responses. At the same time, Eikanas served a request for production of documents requesting that CRA produce all documents identified in its interrogatory responses.

CRA responded to the interrogatories regarding expense reimbursements by stating: "Pursuant to *Code of Civil Procedure* section 2030.230, Eikanas may ascertain the requested information from a review of documents entitled '*General Ledger*.' CRA will produce those documents." (Italics added.) Although CRA did produce some documents and a Dropbox link to about 700 pages of documents, few, if any, of the documents were relevant or responsive to the interrogatories.

Plaintiffs' failure to produce the documents entitled "General Ledger" became the focal point of the discovery dispute. Neither CRA nor CVI ever produced a general ledger. Defendants ultimately learned that both CRA and CVI maintained their financial and accounting data, including their general ledgers, in a cloud-based software program called Yardi and Plaintiffs had always had the ability to access, retrieve, and produce their records maintained on Yardi data files or on backup files.

### III. Defendants' Efforts to Compel Plaintiffs to Comply with Their Discovery Obligations

A. *Defendants' Motions to Compel*

In February 2015, Summit brought motions to compel CRA and CVI to produce documents in response to Summit's first and second sets of requests for production of documents. Eikanas brought a motion to compel CRA to provide further responses to his special interrogatories and a motion to compel CRA to produce

6

documents in response to his request for production of documents. All motions sought monetary sanctions.

In July 2015 Michael Gary Balmages (the Referee) was appointed by the trial court to hear and determine discovery matters, and the discovery motions were referred to him. In August, the Referee ordered Plaintiffs to produce all responsive documents, including their general ledgers, no later than October 2 (later extended by stipulation to November 30). The Referee also ordered Plaintiffs to identify the original servers used to transmit or store electronic documents and data relating to Summit.

On the November 30 deadline, Plaintiffs produced some documents, but their document production was incomplete and did not include general ledgers or the (yet undisclosed) Yardi data files. After two more discovery conferences in December 2015, the Referee issued a report and recommendation in which he recommended that "Plaintiffs be ordered to complete their document production by January 30, 2016, with all issues relating to Defendants' requests for sanctions remaining open for future decision." The trial court adopted the Referee's recommendation.

Meanwhile, on December 18, 2015, Plaintiffs responded to the Referee's order to identify the original servers. In a verified response, Plaintiffs made the representation that in 2014 they had hired a computer vendor to transfer all of CRA's and CVI's electronic data from existing servers onto two hard drives. Plaintiffs represented that they had no other storage devices.

B. *The 1.8 Million-page Document Production and Production of Other Purported Ledgers*

In January 2016, Plaintiffs produced about 1.8 million pages of documents and told the Referee it had completed its production of documents. We refer to this production as the 1.8 million-page document production. No general ledgers or documents relating to CRA's and CVI's cash flow for 2009-2014 were produced.

7

In an e-mail dated March 9, 2016, Eikanas's counsel informed WSS the 1.8 million-page document production did not include general ledgers. An attorney from WSS, Mark Ehrlich, responded by asserting: "The production contains hundreds of general ledgers identified as responsive using the Technology Assisted Review approved by the Discovery Referee. We produced the documents as searchable PDF's, which allows you to easily locate and review these ledgers, and any other groups of documents of interest to you." Nine days later, Plaintiffs produced an Excel spreadsheet identifying every document they had produced that refers to a general ledger. In a letter, Ehrlich wrote, "As you will see upon review of the documents referenced in the Excel spreadsheet, Plaintiffs produced nearly 4,000 documents relating or referring to General Ledgers, not all of which are property specific." None of 4,000 documents was a general ledger for CRA or CVI.

In March 2016, Summit again raised with the Referee the matter of Plaintiffs' failure to produce the general ledgers identified in response to Eikanas's special interrogatories. The Referee prepared recommendations, the trial court approved them, and they were made into an order entered in May 2016. The order required Plaintiffs to provide "full, complete and non-evasive answers" to Eikanas's special interrogatories with the proviso that an answer would be deemed nonresponsive if it stated the requested information could be ascertained from a review of documents entitled general ledger.

On May 31, 2016, Plaintiffs produced a 607-page document in .pdf format purporting to be CVI's general ledger; however, this document was illegible and unusable. Plaintiffs also served supplemental interrogatory responses which attempted to evade the proviso in the May 2016 order by referring to various Bates-labeled documents entitled "General Ledger" instead of providing answers. Eikanas's counsel protested, and the matter went back to the Referee, who ordered Plaintiffs to produce "the General Ledger in native format" by July 29, 2016.

8

On July 29, 2016, Plaintiffs produced what was purported to be, in native format, the general ledger identified in response to Eikanas's special interrogatories. We refer to this production as the July 29, 2016 ledger. In fact, what Plaintiffs produced were .jpg files that had been cut and haphazardly pasted into unusable Excel spreadsheets.

The matter went back, again, to the Referee who, after conducting another in-person conference, ordered Plaintiffs to confirm whether the general ledgers were available in native format, and, if they were, to produce them. If the general ledgers were not so available, then Plaintiffs would be ordered to provide a declaration stating the general ledgers were no longer available in the format in which they were originally created, and Defendants would be entitled to depose the custodian of records with control of the general ledgers.

C. *False Declaration*

On August 12, 2016, Plaintiffs served a declaration from Arto Nuutinen, the president, chief executive officer, and general counsel of CRA and of CVI, stating that the July 29, 2016 ledger included CRA's and CVI's "general ledgers in the native format in which Cornerstone maintains them in the ordinary course of business (i.e., as excel spreadsheets that contain PDF images of the ledgers)."

Nuutinen made false statements in his declaration. The July 29, 2016 ledger was not in the native format of the general ledgers, did not include a ledger for CRA or CVI, and omitted at least 10 categories of expenses, including payroll and rent. The truth was learned in the deposition of the person whom Plaintiffs had designated as most knowledgeable—Terry Roussel, the founder and majority owner of both CRA and CVI. Roussel disclosed that the general ledgers for CRA and CVI were maintained on Yardi, the Yardi data files were the most original form of the general ledgers, the Yardi data files were in the possession of CRA and CVI and within the control of their accountant, and the Yardi data files had always been accessible in their original format.

9

D. *Motion for Discovery Sanctions Against Plaintiffs Based on Responses to Eikanas's Special Interrogatories*

In August 2016, Defendants filed a joint motion for sanctions against Plaintiffs based on their responses to Eikanas's special interrogatories. The next month, the Referee issued a report and recommendation finding that Plaintiffs had failed, without substantial justification, to fully and timely comply with two court orders directing them to answer Eikanas's special interrogatories. The Referee recommended imposition of monetary sanctions against Plaintiffs in the amount of $45,000.

In an order entered on October 31, 2016, the trial court adopted the Referee's recommendation and ordered Plaintiffs to pay $45,000 in discovery sanctions.

E. *Motions for Summary Adjudication*

In January 2017, Defendants filed motions for summary adjudication of issues relating to Plaintiffs' complaint and Defendants' cross-complaint. In support of the motions, Defendants submitted a declaration from Petrucci and a declaration from CVI's former accountant, Nancy Baccaro. Both Petrucci and Baccaro declared that Summit had paid CVI to cover Summit's portion of its first-quarter 2014 payroll and rent obligations and, as a consequence, CVI's failure to meet its payroll obligations on March 31, 2014 was not attributable to anything Summit did or failed to do.

Plaintiffs, in opposing the summary adjudication motions, argued that Defendants' evidence was "facially deficient" because Defendants had failed to include "direct evidence," such as documents, to demonstrate that they had paid anything to CVI.

The trial court granted, in large part, the motions for summary adjudication on the complaint, with the result that a large amount of Plaintiffs' claims was adjudicated in Defendants' favor. The court denied the motion for summary adjudication on the cross-complaint, with but one minor exception.

10

F. *Motion to Compel Production of the CVI General Ledger*

In April 2017, Defendants again moved to compel CVI to produce its complete general ledger. Defendants argued the July 29, 2016 ledger consisted of "unsearchable and randomly arranged jpeg images dropped into hundreds of separate Excel spreadsheets" and omitted all information regarding office rent, office costs, and capital or other distributions. Plaintiffs argued in response that it had produced "all pages of the General Ledgers in its possession custody and/or control" and that the data from the July 29, 2016 ledger had been extracted by their accountant (a firm called Now CFO) from CVI's Yardi accounting files, stored in .pdf format, and imaged onto Excel spreadsheets. Plaintiffs submitted another declaration from Nuutinen, in which he claimed that Plaintiffs and Now CFO did not have access to Plaintiffs' Yardi account because it had been closed.

In June 2017, after an in-person conference, the Referee ordered Plaintiffs, by the end of business on June 14, to advise all parties on several issues, including: (1) whether Plaintiffs' Yardi account could be activated or re-activated; (2) whether a search for the "general ledger" had been performed; and (3) whether CRA or CVI maintained and had access to their general ledgers through an accounting software program. Plaintiffs never complied with the Referee's order.

**IV. It is Revealed that CRA and CVI Had Access to the Yardi Data Files Since July 2014.**

Summit noticed the deposition for Now CFO's personal appearance and production of documents, and requested production of CVI's complete general ledger for the time period January 1, 2007 through April 1, 2014 and all communications between Now CFO and Yardi relating to CRA or CVI.

During the preparation for the deposition of Now CFO, Baccaro, who had been CVI's in-house accountant until April 1, 2014, disclosed that she had in her possession a copy of certain CVI ledgers downloaded from Yardi. Summit obtained a

11

copy of the ledgers from Baccaro and promptly produced it to Plaintiffs. For various reasons, CVI's cash flow and financial condition could not be determined from the parts of the ledgers in Baccaro's possession. A comparison of the CVI ledgers provided by Baccaro with the documents from the July 29, 2016 ledger revealed the latter omitted nearly all of CVI's expense ledgers.

On August 31, 2017, during a telephone interview of Now CFO, Defendants' counsel learned that from the outset of the litigation Plaintiffs had had in their possession, custody, or control Yardi backup files and the complete general ledgers, in native format, for CRA, CVI, and CIP for the period 2009-2014. Robert Grimm, a director of Now CFO, later declared: (1) CVI's general ledger was available in the format in which it was originally created to anyone with a Yardi account; (2) Plaintiffs had a full backup copy of the Yardi data files and, by reactivating their Yardi account, would have had access to the general ledgers in the original format in which they had been created; and (3) in August 2014 he had delivered to Roussel a disk with all the downloaded Yardi data for CRA and CVI, including the Yardi backup files, which included the general ledgers. TJ Delight, a partner of Now CFO, confirmed that in July 2014 CVI had given Now CFO access to the Yardi account and that since August 2014 Plaintiffs and Now CFO had had full copies of CRA's and CVI's backup files, accessible in original format.

Following the telephone interview, Now CFO produced thousands of pages of documents and electronic files, including CRA's and CVI's Yardi data files, which contained all the ledgers and other accounting and financial materials that Defendants had been seeking since near the outset of the litigation.[1]

---

[1] The financial data in the Yardi files and the July 29, 2016 ledger gave significantly different portrayals of CVI's financial condition. According to the July 29, 2016 ledger, CVI's total assets at the end of 2013 were $65,222,537.10 and total liabilities were $2,575,428.87. According to the Yardi backup files, CVI's total assets at the end of 2014 were $1,727,808.75 and total liabilities were $7,756,800.98. The Yardi backup files also

12

## V. Motion for Terminating and Monetary Sanctions

In May 2018, Defendants filed a motion for terminating, issue, evidence, and adverse inference sanctions, and monetary sanctions of $3,539,200 against Plaintiffs and their counsel, WSS (the Motion for Terminating Sanctions).[2] The notice of motion summarized the basis for motion as follows: "This motion is based on the 3.5-year concealment of the general ledgers of CVI, CRA and CRA's managing member Cornerstone Industrial Properties ('CIP') for the period 2009-2014 and the Yardi accounting data files containing those general ledgers by Plaintiffs, Cross-Defendants and WSS, and upon Plaintiffs' production of a general ledger that materially misstated Plaintiffs' cash flow and financial condition. It is undisputed that Plaintiffs' general ledgers and Yardi data files should have been produced in June 2014 in response to Summit's first document request in May 2014. Had they been produced at that time, Plaintiffs' complaint would have been dismissed summarily much earlier."

In opposing the Motion for Terminating Sanctions, Plaintiffs did not contest the basis for the motion or the reasonableness of the sanctions sought, but raised only procedural and technical deficiencies in the motion. WSS opposed the motion on the grounds that it had not advised its clients to engage in discovery misconduct and that Defendants had suffered no prejudice because they ultimately obtained the accounting records from a third party source (Now CFO). WSS submitted a declaration from Valerie N. Gallo, a former WSS attorney who had worked extensively in this litigation.

---

showed that Plaintiffs and their affiliates collectively had cumulative losses of over $10.3 million from 2009 through December 31, 2014. The Yardi backup files thus undercut Plaintiffs' claim that Summit's conduct in late 2013 and early 2014 had placed CRA and CVI in precarious financial situations.

[2] The motion initially was filed, at the trial court's direction, as a motion in limine. The trial, originally set for October 2017, was continued to February 2018. At that time, the action was designated as complex and assigned to a new judge, who directed Defendants to resubmit their motion as a sanctions motion instead of a motion in limine.

## VI. The Referee's Report and Recommendation
## Regarding the Motion for Terminating Sanctions

The trial court referred the Motion for Terminating Sanctions to the Referee for his report and recommendation. After a hearing on August 23, 2018, the Referee found: (1) "plaintiffs' three plus year failure to produce the Yardi files, and the hoops they made the defendants jump through to get them, were an egregious breach of plaintiffs' discovery obligations" and (2) "[WSS]'s role in that failure was unfortunate and questionable and not best practices, but may not have risen to the statutory and case [law] required level of advising the client to not comply." The Referee also found that WSS had not yet carried its burden of proving it did not advise Plaintiffs to breach their discovery obligations, but granted WSS the opportunity to submit declarations from Brandon S. Reif and Mark Ehrlich, the two WSS partners who were primarily responsible for representing Plaintiffs in the litigation. The Referee granted Plaintiffs additional time to make brief comments on Defendants' request for evidentiary and issue sanctions, and Defendants additional time to submit an analysis of extra expenses they had incurred as a result of Plaintiffs' failure to produce the Yardi data files.

Defendants submitted a summary of attorney fees and costs identifying in detail the fees and costs they contended had been incurred as a result of Plaintiffs' misuse of the discovery process. The attorney fees and costs came to a total of $2,034,592.07. (Defendants did not waive their original request of over $3.5 million.)

WSS submitted a declaration each from Reif and Ehrlich. Both Reif and Ehrlich disclaimed ever having advised their clients to engage in discovery abuse and claimed they had sought to comply fully with their discovery obligations and always had acted with integrity and good faith.

In October 2018, the Referee issued a 32-page report and recommendation (the Referee's Final Report) recommending an evidence sanction and an adverse inference instruction against Plaintiffs, and imposition of monetary sanctions in the

14

amount of $186,000. The Referee recommended monetary sanctions because he believed "Plaintiffs' behavior to be egregious and in direct violations of their obligations to forthrightly and honestly respond to discovery responses" and "[t]here was no substantial justification for Plaintiffs to have hidden the general ledgers for three years and to have misled everyone about them."

The Referee found that WSS, now former counsel for Plaintiffs, be held jointly and severally liable for the monetary sanctions. The Referee acknowledged that "[t]he WSS issue is hard for me," the WSS attorneys "all say that they did not advise Plaintiffs to not produce the ledgers or do anything inappropriate," and "they also say that they relied on what their clients told them." The Referee found, however, that WSS had not done enough to produce the ledgers, which "were always there and easy to obtain," that Plaintiffs and WSS had been given "several opportunities and much time to find and produce them," that the stories told by WSS about difficulties in obtaining the ledgers "seem disingenuous at best," and that WSS appeared to have misled him and opposing counsel. The Referee concluded, "WSS's failure to do more is, I believe, tantamount to them advising their clients to withhold the ledgers."

As an evidence sanction, the Referee recommended that Plaintiffs be barred from introducing into evidence the July 29, 2016 ledger and, as an issue sanction, recommended that the jury be instructed that Plaintiffs had failed to produce their general ledgers for the years 2009-2014 and the jury could assume those general ledgers contained information disproving Plaintiffs' claims.

## VII. The Trial Court's Rulings

A. *Tentative Ruling*

Nobody was happy with the Referee's Final Report: Defendants, Plaintiffs, and WSS all filed objections to it.

15

In November 2018, the trial court issued a tentative ruling that differed from the Referee's Final Report in three significant respects:

First, the trial court tentatively ordered terminating sanctions against Plaintiffs, which would result in the dismissal of their complaint. This sanction, though drastic, was justified, the court believed, because "there were multiple orders compelling [Plaintiffs] to produce the financial records, but plaintiffs never complied with these orders." Moreover, the court reasoned, the evidence and adverse inference sanctions would almost certainly lead to a defense verdict anyway.

Second, the trial court tentatively increased the amount of monetary sanctions from that recommended by the Referee to $1,011,456. That sum was comprised of $797,264 in attorney fees incurred by Defendants after July 12, 2016 in seeking to obtain the general ledgers, $77,790 in fees incurred by Defendants to controvert Plaintiffs' damages expert (who had relied on false financial statements), expert witness fees of $119,440, and discovery referee fees of $16,962.

Third, the trial court tentatively decided not to impose monetary sanctions against WSS. On this point, the court found that WSS had satisfied its burden of showing it did not advise the conduct giving rise to the discovery sanctions.

B. *No Sanctions Against WSS*

At the hearing on the Motion for Terminating Sanctions, held on November 30, 2018, the trial court, confirming its tentative ruling, denied Defendants' motion to make WSS liable for the monetary sanctions. The court granted Plaintiffs' request to submit additional briefing on the issue of terminating sanctions and continued the hearing to February 13, 2019.

C. *Terminating Sanctions and Monetary Sanctions Against Plaintiffs*

Before the date of the continued hearing, Defendants filed two more motions seeking monetary sanctions. The first motion (the Additional Motion for

Sanctions) requested monetary sanctions in the amount of $460,307.50 for attorney fees and costs incurred by Defendants in reviewing the 1.8 million-page document production. Defendants made this motion "out of an abundance of caution" because the trial court had made a comment at the November 30, 2018 hearing to suggest the court "might not consider Plaintiffs' 1.8 million-page document dump as part of Plaintiffs' discovery misuse." This motion requested sanctions against Plaintiffs and WSS.

The second motion (the Motion for Supplemental Fees) requested supplemental attorney fees and costs in the amount of $482,720.33 comprised of: (1) $14,742.50 in additional discovery referee fees; (2) $213,568.77 in attorney fees and costs incurred after the Motion for Terminating Sanctions was filed; (3) $205,817.60 in attorney fees and costs that were incurred before July 12, 2016 that previously had not been sought from the Referee or the court; and (4) $48,591.46 in costs incurred in trying to obtain Plaintiffs' financial records, pursuing alternative discovery, and bringing the motions for sanctions.

The trial court, confirming its tentative ruling, imposed terminating sanctions against Plaintiffs and ordered their complaint be dismissed. The court did not confirm its tentative ruling on the amount of monetary sanctions: Instead, the court reduced the award of attorney fees to one-half of the tentative amount—from $875,053.81 to $437,526.91—and increased the award of costs from $136,402.25 to $151,144.75 for a total sanction award of $588,671.66. At the hearing, the trial court stated that since making the tentative ruling, and in light of Defendants' recent motions seeking more in monetary sanctions, it had reassessed the amount of monetary sanctions and determined that a large amount of the fees sought by Defendants was unreasonable.

The trial court denied Defendants' Additional Motion for Sanctions on the grounds it had denied a comparable motion against WSS, the motion was in effect a motion for reconsideration, Defendants had not raised the issues presented by the motion to the Referee, Defendants' notice of appeal had divested the trial court of jurisdiction,

and the motion had no merit. The court deemed Defendants' Motion for Supplemental Fees to be supplemental papers in support of Defendants' motion for sanctions, "incorporated and considered for that motion."

Plaintiffs' complaint was dismissed, and Defendants voluntarily dismissed their cross-complaint. A judgment, which incorporated the rulings on the Motion for Terminating Sanctions, was entered in March 2019.

## VIII. Appeals

In December 2018, Defendants filed a notice of appeal from the order denying their motion for sanctions against WSS. In May 2019, Plaintiffs filed a notice of appeal from the final order and judgment. Defendants filed a notice of cross-appeal from the order granting terminating sanctions and imposing monetary sanctions against Plaintiffs. We issued an order consolidating the appeals for all purposes. Plaintiffs' appeal was dismissed by order entered on July 9, 2019, and a partial remittitur has been issued.

## DISCUSSION

## I. Standard of Review

Orders regarding discovery are reviewed under the abuse of discretion standard. (*Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 878 (*Ellis*); *Tucker v. Pacific Bell Mobile Services* (2010) 186 Cal.App.4th 1548, 1560 (*Tucker*).) The trial court has broad discretion in deciding whether to impose sanctions and in setting the amount of monetary sanctions. (*Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 183; *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 294 (*Parker*); *McFarland v. City of Sausalito* (1990) 218 Cal.App.3d 909, 913.)

The test for abuse of discretion is whether the trial court's decision exceeded the bounds of reason. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) In applying the abuse of discretion standard, the reviewing court measures the evidence

18

presented to the trial court against the range of options permitted by the established legal criteria. (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089.) The scope of the trial court's discretion is limited by the governing law, and an action that ""'"transgresses the confines of the applicable principles of law"'"" constitutes an abuse of discretion. (*Ibid.*)

The trial court's factual findings are reviewed under the substantial evidence standard while the trial court's legal conclusions are reviewed de novo. (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1230.) It is up to the trial court to weigh the evidence, resolve conflicts in it, and assess the credibility of witnesses. (*Tucker, supra*, 186 Cal.App.4th at p. 1562.) The reviewing court resolves any evidentiary conflicts most favorably to the trial court's ruling (*Ellis, supra*, 218 Cal.App.4th at p. 878), and, if more than one reasonable inference can be deduced from the facts, the reviewing court must accept the inference supporting the trial court's decision (*Shamblin v. Brattain, supra*, 44 Cal.3d at pp. 478-479).

## II. Amount of Monetary Sanctions

In challenging the amount of monetary sanctions, Defendants start by arguing the trial court erred by not awarding them the full $2,034,592.07 in sanctions they sought. Defendants then identify seven categories of attorney fees and costs which, they claim, were incurred as a result of Plaintiffs' misuse of the discovery process but for which the trial court either awarded not enough or no monetary sanctions. After reviewing the relevant law, we address Defendants' overall challenge to the sanctions award, and then we address in turn each of the seven categories.

A. *Relevant Law*

California law authorizes a range of penalties for conduct amounting to "misuse of the discovery process." (Code Civ. Proc., § 2023.030; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12.) Code of Civil Procedure

section 2023.030 authorizes a trial court to impose monetary sanctions, issue sanctions, evidence sanctions, or terminating sanctions against "anyone engaging in conduct that is a misuse of the discovery process."  (See *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991 (*Doppes*).)

"The court may impose a monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct."  (Code Civ. Proc., § 2023.030, subd. (a) (section 2023.030(a)).)  Reasonable expenses may include attorney fees, filing fees, referee fees, and other costs incurred. (*Ibid*.; *Clement v. Alegre* (2009) 177 Cal.App.4th 1277, 1285.)

Relevant to this appeal are three of the principles governing the award and amount of attorney fees and costs imposed as a discovery sanction.  The first principle is compulsion:  If a monetary sanction is authorized, "the court *shall impose* that sanction" unless the court finds that the person subject to the sanction either acted with substantial justification or imposition of sanctions would be unjust under the circumstances. (§ 2023.030(a), italics added.)  "[M]onetary sanctions, in an amount incurred, including attorney fees, by anyone as a result of the offending conduct, *must be imposed* unless the trial court finds the sanctioned party acted with substantial justification or the sanction is otherwise unjust." (*Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154, 191 (*Department of Forestry*), italics added.)

The second principle is causation:  Monetary sanctions for engaging in misuse of the discovery process may only be imposed based on attorney fees and costs "incurred by anyone *as a result* of that conduct."  (§ 2023.030(a), italics added.)  In *Department of Forestry, supra,* 18 Cal.App.5th at page 195, the Court of Appeal reversed an order awarding monetary sanctions because the discovery motions did not explain how attorney fees had been incurred as a result of the discovery abuses:  "Therefore, we are unable to ascertain from the record which attorney fees and expert fees and expenses

20

were incurred as a result of the discovery misuses for which we have concluded there is substantial evidence in the record to support imposition." (*Ibid.*)

The third principle, and the most significant one for our purposes, is reasonableness: The amount of monetary sanctions is limited to the "*reasonable* expenses, including attorney's fees" that a party incurred as a result of the discovery abuse. (§ 2023.030(a), italics added.) The principle of reasonableness means a trial court has discretion to reduce the amount of fees and costs requested as a discovery sanction in order to reach a reasonable award. (*Parker, supra,* 149 Cal.App.4th at p. 294; *Ghanooni v. Super Shuttle* (1993) 20 Cal.App.4th 256, 262 (*Ghanooni*).)

B. *The Trial Court Was Not Required to Award the Full Amount of Sanctions Requested.*

Defendants initially sought $3.54 million in sanctions, but then, in response to a request by the Referee, filed papers lowering that amount to $2,034,592.07. According to Defendants, the trial court had the duty to impose monetary sanctions in an amount at least sufficient to cover their attorney fees and costs incurred as result of Plaintiffs' discovery abuses, and that amount was at least the $2 million plus that they had requested.

The trial court was not required to award sanctions in the full amount requested by Defendants. Although the principle of compulsion imposed an obligation on the trial court to award monetary sanctions, the principles of reasonableness and causation imposed on the trial court the duty, and granted the court discretion, to fix a reasonable amount of monetary sanctions and to determine which fees were not incurred as a result of discovery abuse. Thus, for example, in *Parker, supra*, 149 Cal.App.4th at page 294, the Court of Appeal held that the trial court did not abuse its discretion by reducing sanctions to one-third of the amount requested and, in *Department of Forestry, supra*, 18 Cal.App.5th at page 191, the Court of Appeal held that attorney fees that were

21

not shown to have been caused by the discovery abuses could not be included in the sanctions award.

The trial court also had the authority to assess the credibility of witnesses, including those presenting testimony by declaration, and therefore was not compelled to blindly accept representations and assertions made in the declarations presented by Defendants. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996; *United Health Centers of San Joaquin Valley, Inc. v. Superior Court* (2014) 229 Cal.App.4th 63, 74; *Tucker, supra*, 186 Cal.App.4th at p. 1562.)

Defendants rely on *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152 (*Sherman*) and *Doppes, supra*, 174 Cal.App.4th 967 as supporting their argument that the trial court had a duty to impose the full amount of monetary sanctions sought. In *Sherman*, a panel of this court held that the trial court should have granted a new trial and imposed discovery sanctions against the defendant for concealing crucial documents. (*Sherman, supra*, 67 Cal.App.4th at p. 1155.) The appellate panel stated: "As for discovery sanctions, the court had not only the power, but the duty to sanction [the defendant], in a monetary amount *at least* sufficient to cover all the costs incurred by the [plaintiffs], including attorney fees, in going through a trial which now must be redone." (*Id*. at pp. 1155-1156.)

In *Doppes,* a different panel of this court concluded that the trial court had abused its discretion by failing to impose terminating sanctions against the defendant for its continued misuse of the discovery process. (*Doppes, supra*, 174 Cal.App.4th at pp. 972-973.) Monetary sanctions for discovery abuse were not an issue on appeal. The plaintiff, who ultimately won at trial, moved the trial court to recover attorney fees incurred as the prevailing buyer in a lawsuit under the Song-Beverly Consumer Warranty Act. The relevant statute, Civil Code section 1794, subdivision (d), allowed recovery of attorney fees "'based on actual time expended'" in an amount determined by the court "'to have been reasonably incurred by the buyer in connections with the commencement

and prosecution of such action.'" (See *Doppes, supra*, 174 Cal.App.4th at p. 997.) The appellate panel concluded that the trial court should have awarded the plaintiff his attorney fees incurred in connection with proceedings before a discovery referee because the plaintiff had not previously been compensated for them, and the trial court's finding that the discovery referee had awarded the plaintiff monetary sanctions was incorrect. (*Id*. at p. 1001.)

The quoted passage from *Sherman* states the principle of compulsion, i.e., the trial court had to impose monetary sanctions. *Sherman* does not address the principles of reasonableness and causation. The *Doppes* panel did not address monetary sanctions for discovery abuse. Assuming the standards for attorney fees under the Song-Beverly Consumer Warranty Act are the same as those for monetary sanctions for discovery abuse, the part of *Doppes* relied on by Defendants holds only that the trial court had erroneously found that the plaintiff had already recovered attorney fees incurred in proceedings before the discovery referee. It is significant that in *Doppes* the appellate panel concluded the trial court did not err by denying the plaintiff a large portion of the attorney fees he had requested. (*Doppes, supra*, 174 Cal.App.4th at pp. 998-999.)

Defendants assert that, by imposing only $588,671.66 in monetary sanctions, the trial court, despite having granted them terminating sanctions, "failed to apply" the principles governing imposition of discovery sanctions, made an "arbitrary" ruling, exerted "little or no effort" to ascertain the proper amount of damages, and "shirked its 'duty' under Section 2023.030." Impugning the integrity of the trial judge without facts is rarely a good idea (see *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 858), and serious accusations against a trial judge, such as these, had better be supported by concrete evidence. Defendants have provided none.

As evidence the trial court acted out of hostility rather than reason, Defendants point to a few comments the court made at the February 13, 2019 hearing. When Defendants' counsel asked to address the Motion for Supplemental Fees, the court

23

stated, "[y]ou mean where the one million originally ordered wasn't enough out of the three million you requested, and you want more?" After counsel argued, the court related how, as a practicing attorney, he had observed judges denying monetary sanctions after granting terminating sanctions because the prevailing party had received the ultimate sanction. The court made the comment, "[s]o when you argue it's not enough money, I just kind of get reminded of that."

Not in the least do these comments show that the trial court shirked its duty, made little or no effort to ascertain a proper amount of sanctions, or made an arbitrary ruling. The trial court awarded Defendants monetary sanctions in an amount over three times greater than the amount recommended by the Referee and imposed terminating sanctions against Plaintiffs—which the Referee had not recommended. The court expressly stated it was considering the Motion for Supplemental Fees as part of the Motion for Terminating Sanctions. Our review of the record shows that the trial court applied the principle of reasonableness to conclude that a large portion of the fees sought by Defendants was unreasonable. We firmly reject Defendants' assertion that the trial court did not fulfill its duties in ruling on the Motion for Terminating Sanctions.

C. *Specific Categories of Attorney Fees and Costs Claimed by Defendants*

1. *$875,053.81 in Attorney Fees Incurred Between July 12, 2016 and August 27, 2018*

Defendants requested $875,053.81 in attorney fees that they had incurred between July 12, 2016 and August 27, 2018 in attempting to obtain Plaintiffs' financial and accounting records and general ledgers, using alternative discovery methods to obtain Plaintiffs' financial information, preparing the Motion for Terminating Sanctions, and controverting Plaintiffs' expert, who had relied on CVI's false financial records. Defendants argue the trial court erred by awarding only $437,526.91 in attorney fees because nobody—not Plaintiffs or WSS—had ever contended that Defendants did not

24

pay $875,053.81 in attorney fees between July 12, 2016 and August 27, 2018 or that any of those fees were not incurred as a result of Plaintiffs' misuse of the discovery process.

The failure by Plaintiffs and WSS to challenge the amount of monetary sanctions does not mean the trial court was legally compelled to award the full amount requested. The amount of monetary sanctions is subject to the principles of reasonableness and causation: The trial court had discretion to decide the amount of a reasonable sanction and to exclude from the sanctions award those costs and attorney fees not incurred as a result of the sanctioned conduct. (§ 2023.030(a); *Parker, supra*, 149 Cal.App.4th at p. 294 [trial court did not abuse discretion by reducing sanctions by two-thirds of the amount requested].)

At the hearing on February 13, 2019, the trial court provided reasons for reducing the amount of monetary sanctions from the amount in the tentative ruling. The court, in addressing the Additional Motion for Sanctions and the Motion for Supplemental fees, stated: "[A]ll these filings from the last hearing make me reassess that, when I'm imposing monetary sanctions, the standard is to award only reasonable attorneys' fees. And last time I identified certain categories of attorneys' fees that Defendants listed as allegedly relating to this issue of what I'll call the phony financial information and awarded Defendants the full amount of those fees. [¶] However, based on these filings that have happened since then, it has caused me to reassess, and it's become apparent that a large amount of fees incurred by the Defendants are what I would call unreasonable attorney's fees."

These comments show that the trial court considered the total amount of sanctions requested by Defendants, and, applying the principle of reasonableness, exercised its discretion to award an amount that the court deemed to be reasonable. The trial court's award, though not as much as Defendants would have liked, was over three times larger than the amount recommended by the Referee and came on top of terminating sanctions. We cannot say the trial court abused its discretion.

## 2. *$88,965.63 in Costs Incurred Between June 19, 2014 and August 27, 2018*

Defendants argue the trial court erred by failing to impose sanctions of $88,965.63 for the costs they incurred between June 19, 2014 and August 27, 2018 as a result of Plaintiffs' misuse of the discovery process. Those costs included: (1) reproduction, filing, and service costs for its motions to compel Plaintiffs to provide further responses to requests for production sets one and two; (2) reproduction, filing, and service costs for its motions for sanctions; (3) courier services to deliver binders to the Referee; (4) travel costs for in-person discovery conferences with the Referee; (5) transcripts and travel costs for depositions of persons believed to have knowledge about CRA's and CVI's financial condition.

The Referee considered those costs and declined to recommend awarding them. The Referee explained that his recommendation was based on Defendants' failure to substantiate those costs: "Defendants are entitled to an award of their 'reasonable expense[s]' incurred as a result of Plaintiffs' conduct but not an award of every single expense that they incurred in this lawsuit. Unlike the attorney fees, I cannot substitute my experience and judgment for Defendants' failure to specify and explain the costs of service, filing, reproduction and transportation (and meals) that are related to the Plaintiffs' failure to produce the general ledgers. Therefore, I am not in a position to recommend any award for these other expenses."

The trial court awarded sanctions to compensate Defendants for attorney fees, expert witness fees, and Referee fees, and thereby implicitly followed the Referee's recommendation to award no costs. We conclude, in light of the Referee's explanation, the trial court did not err in declining to award costs.

## 3. *$460,307.50 Incurred by Defendants to Review the 1.8 Million-page Document Production*

Defendants sought $460,307.50 in attorney fees they claimed had been incurred in reviewing 1.8 million-page document production. Defendants contend the

trial court erred by excluding from the sanctions award the attorney fees incurred reviewing those documents.

The trial court, we infer, did include in the sanctions award the attorney fees incurred in reviewing the 1.8 million-page document production. Defendants included those fees in its Motion for Terminating Sanctions and the billing statements submitted with that motion included entries for time spent reviewing the 1.8 million-page document production. The Referee considered the various declarations and billing statements presented by Defendants and reached the conclusion to recommend total monetary sanctions of $186,000.

It is reasonable to infer that the trial court's tentative award of $1,011,456 and final award of $586,671.66 in sanctions included some portion of Defendant's attorney fees incurred in reviewing the 1.8 million-page document production inasmuch as those fees were included in the Motion for Terminating Sanctions. Inclusion of attorney fees incurred in reviewing the 1.8 million-page document production could account, at least in part, for the trial court's decision to award a greater amount of sanctions than recommended by the Referee. The trial court never expressly stated it was denying those fees, but reduced them, as it had discretion to do, in order to reach a figure representing the reasonable expenses incurred by Defendants.

4. *$207,085 in Attorney Fees Incurred Before July 12, 2016 in Seeking CRA's and CVI's Accounting and Financial Records and General Ledgers*

Defendants contend they had incurred $207,085 in attorney fees before July 12, 2016 in seeking compliance with the requests for production of documents and to obtain CRA's and CVI's financial and accounting records and general ledgers. In the ruling on the Motion for Terminating Sanctions, the trial court awarded only attorney fees incurred after July 12, 2016. The court seems to have believed that Defendants had already been compensated for attorney fees incurred before that date. But they had not.

27

Eikanas's motion to compel, brought in August 2016, requested sanctions incurred up to July 12, 2016 for attorney fees incurred in connection with Eikanas's special interrogatories only. That motion did not seek sanctions for attorney fees incurred in connection with Summit's requests for production of documents. The trial court followed the Referee's recommendation to impose $45,000 in monetary sanctions, but they were only for CRA's failure to respond fully to Eikanas's special interrogatories. The Motion for Terminating Sanctions requested monetary sanctions for Plaintiffs' failure to produce the general ledgers and other financial and accounting records in response to Summit's and Eikanas's requests for production of documents.

Under the principle of compulsion, the trial court had to impose monetary sanctions in the amount of reasonable expenses incurred by Defendants before July 12, 2016 as a result of Plaintiffs' misuse of the discovery process with respect to Summit's and Eikanas's requests for production of documents. (§ 2023.030(a).) *Doppes, supra*, 174 Cal.App.4th at page 967, is relevant to this issue. In *Doppes*, the trial court made the erroneous finding that the discovery referee had awarded the plaintiff monetary sanctions of $15,000 and, based on that erroneous finding, denied recovery of any attorney fees incurred by the plaintiff in proceedings before the referee. (*Id.* at p. 1001.) A panel of this court concluded the plaintiff was entitled to those fees because "[i]t would be manifestly unjust not to permit [the plaintiff] to recover his attorney fees incurred in the discovery motions and proceedings before the discovery referee because [the defendant]'s bad faith conduct in discovery made those fees necessary." (*Ibid.*)

The trial court in this case erred by categorically denying fees incurred before July 12, 2016, just as the trial court in *Doppes* erred by categorically denying attorney fees incurred in proceedings before the discovery referee. The trial court apparently believed the prior award of $45,000 in monetary sanctions was for Summit's first and second sets of requests for production, just as the trial court in *Doppes* found that the plaintiff had been awarded sanctions for proceedings before the discovery

28

referee. The trial court should have considered Defendants' attorney fees incurred before July 12, 2016, and we remand to give it the opportunity to do so.

5. *$170,147.15 in Attorney Fees Incurred in Bringing Defendants' Motions for Summary Adjudication*

Defendants argue the trial court erred by failing to award the $170,147.15 in attorney fees incurred in connection with Defendants' motions for summary adjudication. Those fees should have been awarded as sanctions, Defendants argue, because Plaintiffs relied on Defendants' inability to cite and rely upon the financial and accounting records in an attempt to defeat the motions for summary adjudication. The trial court concluded that Defendants were not entitled to recover attorney fees incurred in connection with the summary adjudication motions because they "had nothing to do with plaintiffs' financial records."

Under the principle of causation, the question is whether Defendants' attorney fees and costs incurred in connection with the motions for summary adjudication were incurred "*as a result of*" the conduct constituting misuse of the discovery process. (§ 2023.030(a).) The concealment by Plaintiffs of their general ledgers and financial records did not result in or cause Defendants to incur costs and attorney fees in bringing the summary adjudication motions. Those motions were not brought in response to Plaintiffs' misuse of the discovery process.

6. *$96,630.83 in Attorney Fees Incurred in Preparing for Trial*

Defendants argue the trial court erred by failing to include in the sanctions award the $96,630.83 in attorney fees they incurred in preparing for trial. The court concluded Defendants were not entitled to attorney fees incurred in preparing for trial because "they would have to do that anyway."

Defendants' theory of causation is that they would not have had to prepare for trial if Plaintiffs did not conceal the general ledgers and financial and accounting records because, had those ledgers and records been produced at the outset of the

29

litigation, Defendants would have prevailed completely on their motions for summary adjudication. This theory of causation is too attenuated, we conclude, to satisfy the principle of causation. While it appears the Yardi files were favorable to Defendants, the conclusion does not follow automatically that the trial court *would have granted* the summary adjudication motions had the Yardi files been produced in a timely fashion. The Referee commented: "Defendants seem to believe that if they had gotten the general ledgers when they first asked for them, they would have won the case right there and then, slam dunk. Maybe they would have, but that is unlikely and never guaranteed."

7. *$213,568.77 in Attorney Fees and Costs Incurred by Defendants After Filing Their Motion for Terminating Sanctions*

Defendants' Motion for Supplemental Fees sought reimbursement of $14,742.50 in discovery referee fees and $213,568.77 in attorney fees and costs incurred in the additional rounds of briefing ordered by the Referee and trial court after the Motion for Terminating Sanctions had been filed.

The trial court did not categorically exclude the $213,568.77 sought by the Motion for Supplemental Fees but considered them in setting the award of $586,600 in monetary sanctions. The court stated that the Motion for Supplemental Fees "was incorporated and considered for" the Motion for Terminating Sanctions. The court reassessed the amount of sanctions in light of Defendants' recent motions seeking more in monetary sanctions and had determined that a large amount of the fees were unnecessary.

D. *Conclusion*

We conclude that under the principle of compulsion the trial court erred by not awarding attorney fees incurred by Defendants before July 12, 2016 with respect to Defendants' requests for production of documents. After remand, the court must award attorney fees for that time period, in accordance with the principles of causation and reasonableness. Application of the abuse of discretion standard of review, as well as the

30

principles of causation and reasonableness, leads us to uphold the trial court's award of monetary sanctions in all other respects.

### III. Liability of WSS for Monetary Sanctions

The trial court, declining to follow the Referee's recommendation, concluded that WSS was not liable for the monetary sanctions imposed. Defendants contend the trial court erred by failing to hold WSS jointly and severally liable for the monetary sanctions. They assert the court did not review the Referee's Final Report, improperly shifted the burden of proof onto them, erred as a matter of law by not imposing monetary sanctions on WSS for its objections to Summit's request for CRA's and CVI's financial records, and erred by failing to impose monetary sanctions on WSS for making misrepresentations about the 1.8 million-page document production.

A. *Relevant Law*

Section 2023.030(a) permits a trial court to impose discovery sanctions against an attorney "advising that conduct" constituting the misuse of the discovery process. "An attorney may only be penalized under this provision for advising disobedience. It is not enough that the attorney's actions were in some way improper and contributed to the disobedience of the court order." (*Corns v. Miller* (1986) 181 Cal.App.3d 195, 200.) Imposition of monetary sanctions against a party's attorney requires a finding that the attorney advised the party to engage in the conduct resulting in sanctions, and the attorney bears the burden of proving he or she did not so advise the client. (*Ghanooni, supra*, 20 Cal.App.4th at p. 261.)

B. *The Trial Court Reviewed and Considered the Referee's Final Report.*

Defendants contend the trial court never reviewed or considered the recommendation of the Referee's Final Report that WSS be held jointly and severally liable for monetary sanctions. The only basis for that contention is that the court's order

31

does not mention specifically the Referee's recommendation and findings regarding monetary sanctions against WSS.

The trial court's order itself disproves Defendants' claim that the court did not consider the Referee's Final Report. The court's tentative ruling (which was incorporated into the judgment) begins with the statement: "In connection with [D]efendants' motions for terminating and other sanctions, *the court has reviewed the discovery referee's recommendations*, the parties' objections, and the parties' responses to the objections, as well as other documents as necessary, as required by CCP § 643(c). *The court tentatively adopts the findings and recommendations of the discovery referee, except as set forth below*." (Italics added.) The plain meaning of these statements is the trial court reviewed all of the Referee's recommendations, including the one pertaining to WSS. "Absent a contrary indication on the record, we are required to accept the court's statements and presume the court complied with its statutory duties." (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 590.)

Defendants have identified no such contrary indication in the record. The trial court's decision not to follow the Referee's recommendation to impose monetary sanctions against WSS cannot be interpreted to mean the court did not even consider it. When, as in this case, the referee was not appointed by a consensual general reference, the referee's decision is "only advisory" and "[t]he court may adopt the referee's recommendations, in whole or in part." (Code Civ. Proc., § 644, subd. (b); see *Rockwell Internat. Corp. v. Superior Court* (1994) 26 Cal.App.4th 1255, 1269 ["a discovery referee's report is advisory, not determinative"].)

Even though the Referee had dealt with the discovery issues, the parties, and counsel for over two years, the trial court was not compelled to adopt the Referee's recommendations and findings, but could rule on the Motion for Terminating Sanctions in the manner the court deemed appropriate, subject on appeal to the relevant standard of review. The trial court's decision not to adopt some of the Referee's recommendations

32

demonstrates the court did not "abdicate[] its judicial responsibility by simply entering an order on the referee's report as though it were a binding decision of the court itself." (*Rockwell Internat. Corp. v. Superior Court, supra*, 26 Cal.App.4th at p. 1270.)

C. *Substantial Evidence Supports the Trial Court's Decision Not to Impose Monetary Sanctions on WSS.*

In declining to make WSS liable for the monetary sanctions, the trial court made these findings: "WSS has satisfied its burden of showing that it did not advise or even support the conduct which gave rise to the discovery sanctions. If counsel had objected to the discovery requests on the ground that the documents already were in defendants' possession, that would have been a completely meritless objection under the law and would have been a basis on which to justify monetary sanctions against counsel. But plaintiffs' discovery response was that they would produce the documents. They never did, except for the phony financial statements, but all the evidence convinces this court that it was plaintiffs, not their former attorneys, who were responsible for both the production of the phony financial records and the failure to produce plaintiffs' actual financial records. Defendants' response to WSS's objections . . . cites an email suggesting that WSS was told where it might be able to find the records, but the entire email chain shows that WSS followed up on this issue, and reflects an apparently sincere intent to obtain the records and produce them."

Under the abuse of discretion standard, we review the trial court's findings of fact for substantial evidence. (*Packer v. Superior Court* (2014) 60 Cal.4th 695, 710; *County of San Diego v. Gorham, supra*, 186 Cal.App.4th at p. 1230; *Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544.) Substantial evidence supports the trial court's finding that WSS did not advise Plaintiffs to engage in the conduct being sanctioned.

In opposition to the Motion for Terminating Sanctions, WSS submitted a declaration each from Reif, Ehrlich, and Gallo—the three WSS attorneys who had been

primarily responsible for representing Plaintiffs in this litigation. Gallo, who was an attorney at WSS from March 2015 to September 2017, declared that in March 2016 she was assigned the responsibility of obtaining the general ledgers from Plaintiffs and producing them to the other parties to the litigation. From that time until August 2017, she made various efforts to obtain those ledgers and communicated, by telephone and e-mail, with representatives of CRA, CVI, and Now CFO, about producing them.

Gallo's declaration goes into detail about those communications and includes print copies of various e-mails. The long and the short of it is she declared that she had diligently sought to comply with Summit's requests for production of documents and in doing so relied on representations made by CRA, CVI, and Now CFO that in April 2016, Now CFO had sent to her the complete general ledgers from 2009 to 2014. (These became the July 29, 2016 ledger). In a conference call on August 31, 2017, led by Summit's counsel, Gallo learned for the first time that Now CFO had more general ledger files that were responsive to Summit's requests for production of documents and the July 29, 2016 general ledger was inadequate. Gallo concluded by declaring, "I always acted in good faith to procure and produce to Defendants the complete general ledgers that they sought in discovery, and I relied on the representations made to me by my former clients and Now CFO on that subject; particularly with respect to their representations stated above that the general ledgers produced by [Now CFO] on April 7, 2016 represented the complete general ledgers."

Reif declared he supervised the representation of Plaintiffs from the inception of the lawsuit in 2014 until February 2018. He stated: "I declare, without qualification, that I never advised CVI, CRA, Mr. Roussel, Arto Nuutinen or Mr. Pizzurro (collectively, 'Ex-Clients') to conceal or hide any evidence, including but not limited to the general ledgers for CVI and CRA for years 2009-2014 (the 'general ledgers') in this action. I never encouraged, invited or implied to the Ex-Clients to conceal or hide any evidence, including the general ledgers. [¶] . . . [¶] The defendants

34

in this action requested in discovery the general ledgers.  Every time I communicated with Messrs. Russel, Nuutinen and Pizzurro, individually and as principals for CVI and CRA, about the general ledgers, my instruction to them was to gather and produce them. They never objected to nor challenged my instruction."

Reif's declaration gives some detail about communications he had with representatives of CRA, CVI, and Now CFO, and attaches as exhibits print copies of e-mail chains of communication.  In sum, Reif declared:  (1) when Reif spoke with Roussel about the completeness of Plaintiffs' document production, both Reif and Roussel "expressed the desire and intent to make a complete discovery production of the general ledgers"; (2) the general ledgers that were received from Now CFO were produced in discovery "without redaction or suppression by WSS"; and (3) Roussel and Nuutinen assured WSS that the general ledgers produced by Now CFO in April 2016 (the July 29, 2016 ledger) were the complete and original general ledgers and there were no other versions of them.

Ehrlich, like Reif and Gallo, flatly denied ever having advised or encouraged anyone at CRA or CVI to conceal or withhold discoverable documents, including the general ledgers at issue, or otherwise to fail to comply with their discovery obligations.  Ehrlich denied ever personally concealing or withholding discoverable documents or information, including the general ledgers.  He denied directing, encouraging, or inviting anyone at WSS, or being directed, encouraged or invited by anyone at WSS, "to conceal or withhold discoverable information or documents in this case, including but not limited to the General Ledgers and Yardi files at issue."

Ehrlich's declaration, like those of Gallo and Reif, gives some detail about communications with CRA, CVI, and Now CFO regarding production of the ledgers. Ehrlich declared that he and other WSS attorneys spoke with Roussel and Nuutinen and asked them to obtain the general ledgers.  When in 2016 the issue arose whether the documents produced by Plaintiffs were a complete response, Ehrlich directed Gallo to

35

contact CRA and CVI to find out whether there were more documents to produce. CRA communicated with Now CFO about the urgency of obtaining the general ledgers, and, in an e-mail on April 4, 2016, Roussel told Now CFO: "The lawyers are all over me on this."

Ehrlich related communications he had had with Roussel about complying with the Referee's direction that Plaintiffs confirm whether the general ledgers were available in native Excel format. Ehrlich had emphasized the urgency in producing the general ledgers in native format and had asked Roussel to "do everything possible to ensure that Cornerstone had not failed to produce discoverable documents." Roussel responded that no original Excel files were available. Ehrlich declared: "Mr. Roussel and Mr. Nuutinen assured me that the general ledgers provided . . . on April 7, 2016 were the complete General Ledgers requested in discovery, and that neither they nor Now CFO had any other or additional General Ledgers. I relied on these representations in working to respond to the defendants' discovery."

Gallo, Reif, and Ehrlich each declared she or he did not direct or advise anybody at CRA or CVI to conceal or withhold discoverable information; none of them concealed or withheld discoverable information, and all of them had asked CRA and CVI to produce the general ledgers and other financial and accounting records sought by Defendants. The Gallo declaration, Reif declaration, and Ehrlich declaration, along with the exhibits attached to them, constitute substantial evidence to support the trial court's finding that WSS met its burden of showing it did not advise the conduct which gave rise to the sanctions for misuse of the discovery process.

Defendants contend that the trial court had to defer to the Referee's findings of fact, especially as to witness credibility, and therefore had to reject the Gallo, Reif, and Ehrlich declarations. Although the trial court had to defer to the Referee's findings, the court was not bound to accept them. The rule is: "[A] special referee's findings are not binding, and are properly characterized as advisory only. [Citations.]

Nonetheless, '[w]hen the findings of a referee are based in substantial part on the credibility of witnesses, such findings, although not binding on this court, are entitled to great weight in view of the Referee's unique opportunity to observe the demeanor of the witnesses when they testified.'" (*Holt v. Kelly* (1978) 20 Cal.3d 560, 562-563, accord *In re Johnson* (1998) 18 Cal.4th 447, 461 [reference for petition for writ of habeas corpus].) Moreover, "[t]he trial court must independently consider the referee's findings before acting." (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1208.)

We question whether the Referee's findings on the role of WSS in the discovery abuses were entitled to great weight given that Gallo, Reif, and Ehrlich did not present live testimony:  The Referee could not have observed their demeanor when they testified by declaration.  Nonetheless, the appellate record gives us no reason to believe the trial court failed to give great weight to the Referee's findings.  And, giving great weight to the Referee's findings, or even completely deferring to them, would not necessarily make WSS liable for the monetary sanctions.  It is significant that the Referee never made a finding that WSS had advised or even encouraged Plaintiffs to engage in the conduct leading to imposition of sanctions.  Instead, the Referee found that WSS should have done more to obtain the general ledgers, and its failure to do more was "*tantamount* to them advising their clients to withhold the ledgers."  (Italics added.)  This is a mixed finding of fact and law subject to independent review.  (*In re Johnson, supra*, 18 Cal.4th at p. 461.)

The trial court, either independently reviewing the Referee's findings or giving great weight to them, could find that WSS did not advise the conduct leading to the sanctions, which is the only basis on which an attorney can be liable for discovery sanctions.  (§ 2023.030(a).)  Even if WSS should and could have done more to obtain the general ledgers, or even if WSS contributed to Plaintiffs' disobedience of orders to produce the general ledgers, monetary sanctions against WSS would have been unwarranted absent a finding WSS had advised or at the very least actively encouraged

37

Plaintiffs to engage in the conduct constituting the misuse of the discovery process. (*Corns v. Miller, supra,* 181 Cal.App.3d at p. 200.)

D. *The Trial Court Did Not Shift the Burden of Proof onto Defendants.*

Defendants argue the trial court effectively and erroneously shifted the burden of proof onto them because WSS never met its initial burden of proving it did not advise Plaintiffs to engage in the conduct being sanctioned. The basis for this argument is that, in its initial opposition to the Motion for Terminating Sanctions, WSS submitted only the Gallo declaration as proof of what WSS did or did not advise, and Gallo's declaration, according to Defendants, covered only the five-month period of time from March to August 2016. The Reif declaration and the Ehrlich declaration should not have been considered, Defendants argue, because they were submitted only after the Referee, over their objections, permitted WSS to submit additional declarations to meet its burden of proving it did not advise Plaintiffs to engage in misuse of the discovery process.

The Referee acted within his discretion by giving WSS the opportunity to submit the Reif and Ehrlich declarations. A trial court has inherent power to exercise its discretion to control the proceedings before it, and this power includes the authority to receive supplemental or additional declarations for the court's guidance and decision. (*Johnson v. Banducci* (1963) 212 Cal.App.2d 254, 260.) Defendants had a full and fair opportunity to respond to the Reif and Ehrlich declarations, and did so at length.

Defendants acknowledge that Reif and Ehrlich denied ever advising their clients to engage in the conduct leading to discovery sanctions. Defendants argue, however, the Gallo, Reif, and Ehrlich declarations are "self-serving" and "self-serving conclusory denials such as these are not sufficient to meet an attorney's burden to establish that the attorney did not advise discovery abuse." What Gallo, Reif, and Ehrlich said to or advised their clients is within their personal knowledge, and, if none of them ever advised concealing or withholding documents or otherwise misusing the discovery

38

process, they could competently so testify. They need not recount every single communication they ever had with Plaintiffs to testify they never advised Plaintiffs to engage in the conduct being sanctioned. In addition, Gallo, Reif, and Ehrlich each provided evidence to substantiate the general averments that they did not advise the misconduct being sanctioned.

As for their testimony being "self-serving," whether testimony serves the interests of the witness might be relevant to credibility, but witness credibility is a matter within the exclusive province of the trial court, not us. (E.g., *People v. Hovarter, supra*, 44 Cal.4th at p. 996; *People v. Maury* (2003) 30 Cal.4th 342, 403; *Anglin v. Conway* (1953) 41 Cal.2d 683, 688; *Tucker, supra*, 186 Cal.App.4th at p. 1562.) We accept the trial court's determination of the credibility of witnesses presenting testimony by declaration. (*People v. Tapia* (2018) 26 Cal.App.5th 942, 953; *United Health Centers of San Joaquin Valley, Inc. v. Superior Court, supra*, 229 Cal.App.4th at p. 74; *Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 828; *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450.) The trial court, as is apparent from its ruling, found Gallo, Reif, and Ehrlich to be credible.

Defendants warn that if blanket denials of wrongdoing were sufficient, then attorneys could always avoid sanctions. But this is obviously incorrect. Other evidence might contradict the blanket denials or undermine the declarant's credibility. The trial court must assess the credibility of witnesses offering testimony by declaration and can reject such blanket denials if it believes the declarant is not telling the truth.

Defendants' other challenges to the evidence misapprehend the legal standard for sanctioning attorneys, the standard of review, and our deference to the trial court's credibility determinations. For instance, citing *Ghanooni, supra*, 20 Cal.App.4th at page 256, Defendants argue the Gallo declaration, Reif declaration, and Ehrlich declaration were insufficient to meet WSS's burden of proof because they were not unrebutted. Defendants cite, for example, Roussel's declaration and deposition testimony

39

in which Roussel stated he had introduced WSS to Now CFO and instructed Now CFO to give WSS anything it asked for—the implication being that if WSS had asked for the general ledgers it would have gotten them.

In *Ghanooni*, the Court of Appeal concluded the trial court erred by imposing discovery sanctions against counsel because the unrebutted declarations of counsel, along with accompanying documents and a declaration from opposing counsel, proved that counsel did not advise the conduct leading to the discovery sanctions. (*Ghanooni, supra*, 20 Cal.App.4th at p. 261.) Defendants misread *Ghanooni* to mean that unrebutted declarations *are required* to avoid sanctions against counsel; *Ghanooni* held only that in light of the evidence presented in that case, which included unrebutted declarations from counsel, the trial court erred by imposing sanctions against counsel. When the evidence, including declarations, is in conflict, the trial court must resolve the conflict, and we defer to its resolution. (*Ellis, supra*, 218 Cal.App.4th at p. 878; *Tucker, supra,* 186 Cal.App.4th at p. 1562.) There were conflicts in the evidence presented to the trial court, and WSS made statements in its opposition to the Motion for Terminating Sanctions that could be construed as contradicting Reif and Ehrlich. But the trial court, whose task and exclusive province it was to assess the credibility of witnesses and resolve such conflicts in the evidence, believed Gallo, Reif, and Ehrlich, and resolved evidentiary conflicts in favor of WSS.

Defendants argue too that Plaintiffs presented not "one email, letter, memorandum or other document evidencing" a representation by CRA or CVI that either had provided WSS with all of the requested documents. The Reif and Ehrlich declarations themselves constituted evidence of the representations made to them by Plaintiffs and, although documents and e-mail communications might have enhanced the declarants' credibility, it was up to the trial court to determine the effect of lack of corroborating evidence on Reif's and Ehrlich's credibility.

40

E. *The Trial Court Did Not Err by Not Imposing Sanctions Against WSS for Objections to Discovery.*

Defendants contend the trial court erred as a matter of law by not imposing monetary sanctions against WSS because, in response to request Nos. 67, 68, and 81 of Summit's second set of requests for production of documents, WSS posed broad objections that were "completely meritless." Sanctions were required, Defendants argue, because the trial court had made a comment in the tentative ruling that "[i]f [WSS] had objected to the discovery requests on the ground that the documents already were in defendants' possession, that would have been a completely meritless objection under the law and would have been a basis on which to justify monetary sanctions against counsel."

In response to request Nos. 67 and 68, WSS made the objection that each request "seeks information equally available to or within the possession or control or knowledge of Defendants." Monetary sanctions against WSS based on those objections would have been unwarranted for several reasons. First, the Gallo declaration, Reif declaration, and Ehrlich declaration show that WSS did not use the objections as an excuse to resist producing documents. All three attorneys declared they had advised and urged both CRA and CVI to respond fully to the requests for production.

Second, the Motion for Terminating Sanctions did not seek monetary sanctions against WSS based on the objections to request for production Nos. 67, 68, and 81. It would have been rather late in the game to seek sanctions on that ground even if the motion had done so. Summit would have known soon after receiving the responses to its second set of requests for production of documents whether the objection that the documents were available to all parties was meritless. Those responses were served in September 2014; a motion to strike the objections and to impose monetary sanctions against WSS based on those objections should have been made then, not almost four years later.

Finally, the trial court stated at the November 2018 hearing on the Motion for Terminating Sanctions that request No. 67, which requested all accounting records of CRA relating to Summit, was ambiguous, and a "needle in a haystack."

F. *The Trial Court Did Not Err by Not Sanctioning WSS Based on Representations About the 1.8 Million-page Document Production.*

Defendants contend the trial court erred by failing to impose monetary sanctions against WSS for representations it had made regarding the 1.8 million-page document production. The specific representations claimed to be sanctionable are these three statements made by Ehrlich: (1) "The production contains hundreds of general ledgers identified as responsive using the Technology Assisted Review approved by the Discovery Referee"; (2) "As you will see upon review of the documents referenced in the Excel spreadsheet, Plaintiffs produced nearly 4,000 documents relating or referring to General Ledgers, not all of which are property specific"; and (3) "This Excel spreadsheet provides a frame of reference which we believe will permit you to review and analyze the documents produced that relate to 'General Ledgers,' and obviate revisiting past motions to compel."

The Motion for Terminating Sanctions did not seek sanctions against WSS based on any of the quoted statements made by Ehrlich. In the Additional Motion for Sanctions, Defendants sought sanctions against WSS based on representations made in connection with the 1.8 million-page document production. The trial court denied the Additional Motion for Sanctions because it had already denied a motion for sanctions against WSS, the motion was in effect a motion for reconsideration, and Defendants had not raised the issues presented by the motion to the Referee. The trial court did not err by denying the Additional Motion for Sanctions or by declining to impose sanctions against WSS for the 1.8 million-page document production.

42

**DISPOSITION**

The order denying Defendants' motion to impose monetary sanctions against WSS is affirmed. The order imposing terminating sanctions and monetary sanctions against Plaintiffs is reversed to the extent it denies monetary sanctions against Plaintiffs based on the amount of attorney fees incurred by Defendants before July 12, 2016. In all other respects, the order imposing terminating sanctions and monetary sanctions against Plaintiffs is affirmed. The matter is remanded for the trial court to consider monetary sanctions against Plaintiffs only as a result of Plaintiffs' misuse of the discovery process with respect to Summit's first two requests for production of documents. Respondent WSS to recover costs on appeal.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.


43